Slip Op. 19-120

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **VICENTIN S.A.I.C. ET AL.,**<br><br>       **Plaintiffs and Consolidated Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>       **Defendant,**<br><br>**and**<br><br>**NATIONAL BIODIESEL BOARD FAIR TRADE COALITION,**<br><br>       **Defendant-Intervenor and**<br>       **Consolidated Defendant-Intervenor.** | **Before: Claire R. Kelly, Judge**<br><br>**Consol. Court No. 18-00111** |

## OPINION AND ORDER

[Remanding Commerce's final determination.]

Date: September 10, 2019

Daniel L. Porter, James P. Durling, Christopher A. Dunn, and Valerie S. Ellis, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for plaintiffs Vicentin S.A.I.C., Oleaginosa Morenos Hermanos S.A., and Molinos Agro S.A.

Gregory J. Spak and Jessica Lynd, White & Case LLP, of Washington, DC, for consolidated plaintiff LDC Argentina S.A. With them on the brief were Kristina Zissis and Luca Bertazzo.

Joshua E. Kurland, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director. Of Counsel was Catherine D. Miller, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Myles S. Getlan, Jack A. Levy, Thomas M. Beline, and Sarah E. Shulman, Cassidy Levy Kent (USA) LLP, of Washington, DC, for defendant-intervenor and consolidated defendant-intervenor National Biodiesel Board Fair Trade Coalition.

Kelly, Judge: Before the court is a challenge to several aspects of the U.S. Department of Commerce's ("Commerce" or "the Department") final determination in the antidumping duty ("ADD") investigation of Biodiesel from Argentina, for which the period of review was January 1, 2016 through December 31, 2016. See Biodiesel From Argentina, 83 Fed. Reg. 8,837 (Dep't Commerce Mar. 1, 2018) (final determination of sales at less than fair value and final affirmative determination of critical circumstances, in part) ("Final Results") and accompanying Issues and Decision Mem. for the Final Affirmative Determination in the [ADD] Investigation of Biodiesel from Argentina, A-357-820, Feb. 20, 2018, ECF No. 16-5 ("Final Decision Memo"). Plaintiffs Vicentin S.A.I.C., Oleaginosa Morenos Hermanos S.A., and Molinos Agro S.A. (collectively "Vicentin") move for judgment on the agency record, challenging Commerce's decision to adjust constructed value by an estimated value for U.S. revenue related to the sale of renewable identification numbers ("RIN"), and Commerce's finding of a "particular market situation" ("PMS") to justify disregarding Vicentin's soybean costs in Argentina. See Mot. J. Agency R., Oct. 29, 2018, ECF No. 26; Pls.' Br. Supp. Mot. J. Agency R. at 7–46, Oct. 29, 2018, ECF No. 26 ("Pls.' Br."). Consolidated Plaintiff, LDC Argentina S.A. ("LDC Argentina"), also moves for judgment on the agency record, similarly challenging Commerce's decision to adjust constructed value by an estimated value for RINs, and Commerce's PMS determination to justify disregarding domestic soybean costs. See Rule 56.2 Mot. J. Agency R. on Behalf of Consol. Pl. [LDC Argentina], Oct. 29, 2018, ECF No. 25; Mem. of Points & Authorities Supp. Consol. Pl.'s Rule 56.2 Mot. J. Agency R. at 10–24, Oct. 29,

2018, ECF No. 25-1 ("Consol. Pl.'s Br.").[1]  Defendant, the United States, responds that Commerce's decision to account for RINs with a price adjustment is lawful and supported by substantial evidence, and that its finding of a PMS regarding Argentina's soybean prices is lawful and supported by substantial evidence.  See Def.'s Resp. Pls.' Mots. J. Agency R. at 8–43, Apr. 8, 2019, ECF No. 40 ("Def.'s Br.").  For the reasons that follow, the court remands Commerce's adjustment to normal value for an estimated value of RINs, and remands Commerce's decision to disregard domestic soybean prices based on the existence of a PMS.

## BACKGROUND

On April 19, 2017, in response to a petition filed by National Biodiesel Board Fair Trade Coalition ("NBB Fair Trade Coalition"), Commerce announced the initiation of an ADD investigation into imports of biodiesel from Argentina.  See Biodiesel from Argentina and Indonesia, 82 Fed. Reg. 18,428 (Dep't Commerce Apr. 19, 2017) (initiation of less-than-fair-value investigations); see also NBB Fair Trade Coalition Antidumping and Countervailing Duty Petitions, PD 1–15, bar code 3554221-02 (Mar. 23, 2017).  Commerce selected Vicentin Group[2] and LDC Argentina as mandatory respondents because they were the largest exporters by volume of biodiesel to the United States

---

[1] LDC Argentina states that with respect to its challenge to Commerce's adjustment to normal value for an estimated value for RINs for U.S. sales, it endorses Sections I.A–C of Vicentin's brief, and with respect to the arguments and accompanying facts regarding Commerce's "decision to double count the alleged unfair pricing of soybeans in the [antidumping] margin that already was addressed by the [countervailing duty] margin," it endorses Sections III.A–B of Plaintiffs' brief. Consol. Pl.'s Br. at 2.

[2] Commerce selected Vicentin S.A.I.C. and examined data from Vicentin and its affiliates, including Oleaginosa Moreno Hermanos S.A. and Molinos Agro S.A.  See Biodiesel From Argentina, 82 Fed. Reg. 50,391, 50,391 n.5 (Dep't Commerce Oct. 31, 2017) (preliminary affirmative determination of sales at less than fair value, preliminary affirmative determination of critical circumstances, in part) ("Prelim. Results").

during the investigation period.  <u>See</u> Respondent Selection Memo at 3–5, PD 56, bar code 3568950-01 (May 3, 2017).  NBB Fair Trade Coalition filed with Commerce an allegation of a PMS with respect to the respondents' home-market sales prices and reported costs of production in Argentina.  <u>See</u> Petitioner's [PMS] Allegation Regarding Respondents' Home and Third Country Market Sales and Cost of Production, PD 189–98, bar code 3604083-01 (Aug. 2, 2017); <u>see also</u> Tariff Act of 1930 § 773(e), 19 U.S.C. § 1677b(e) (2012).[3]  Specifically, NBB Fair Trade Coalition argued that the PMS in Argentina was such that, without certain adjustments, the respondents' home market prices were unsuitable for comparison to U.S. prices and their costs distorted, thus compelling an alternative calculation methodology for purposes of Commerce's investigation.  <u>See</u> <u>id.</u>  at 1–2.

On October 31, 2017, Commerce issued its affirmative preliminary determination in the investigation, calculating an estimated weighted-average dumping margin of 54.36% for LDC Argentina and 70.05% for Vicentin Group.  <u>See</u> <u>Biodiesel From Argentina</u>, 82 Fed. Reg. 50,391, 50,392 (Dep't Commerce Oct. 31, 2017) (preliminary affirmative determination of sales at less than fair value, preliminary affirmative determination of critical circumstances, in part) and accompanying Decision Mem. for the Prelim. Determination in the Less-Than-Fair-Value Investigation of Biodiesel from Argentina, PD 353, bar code 3632930-01 (Oct. 19, 2017) ("Prelim. Decision Memo").  Commerce preliminarily determined that a PMS existed in Argentina due to the government of Argentina's ("GOA") "pervasive" regulatory control over its biodiesel

---

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

market.  Prelim. Decision Memo at 21.  In particular, Commerce determined that the respondents' home-market sales were made outside the ordinary course of trade because the GOA—rather than market conditions—sets Argentine domestic biodiesel prices.  Id.  Consequently, Commerce decided to disregard home market prices as a basis for normal value and rely instead on constructed value.  Id. at 22–23.

Commerce further determined that a PMS distorts the prices of soybeans, the primary input of biodiesel.  Id. at 23–24.  Commerce reasoned that the purpose of the GOA's export tax regime is to drive down domestic soybean prices, allowing domestic consumers cheaper access to soybeans than if they competed freely with international consumers.  Prelim. Decision Memo at 23–24.  Consequently, Commerce determined that it would adjust respondents' cost of production to account for the distorted soybean prices by substituting a market-determined price for the respondents' reported soybean prices in Argentina.  Prelim. Decision Memo at 24.

Commerce also made an adjustment to normal value in its calculation of the respondents' dumping margins by accounting for an estimated value of RINs.  See Prelim. Decision Memo at 28–30.  RINs are tradeable credits pursuant to a U.S. regulatory scheme administered by the Environmental Protection Agency ("EPA").  Id. at 28–29. The EPA requires that biodiesel producers or importers ("obligated parties") meet an annual "renewable volume obligation," pursuant to which obligated parties must submit RINs equal to the number of gallons of renewable fuel comprising their renewable volume obligation.  See id.  RINs are generated through biodiesel production in the United States or importation of biodiesel.  Id. at 29.  The obligated party that generates RINs may use them to satisfy its renewable volume obligation, or it may trade or sell them to other

obligated parties. Id. Commerce preliminarily determined that, pursuant to this regulatory framework, biodiesel prices in the United States contain embedded RIN values, while sales of biodiesel in Argentina do not carry such values because Argentina does not have a comparable program. Id. at 29. Commerce thus decided to adjust normal value to account for the value of RINs,[4] applying a circumstance of sale adjustment to normal value pursuant to 19 U.S.C. § 1677b(a)(6)(C)(iii). Prelim. Decision Memo at 29–30.

On March 1, 2018, Commerce issued the final determination. See Final Results; Final Decision Memo. Commerce maintained its determinations with respect to adjusting normal value for RINs and finding a PMS, but it modified aspects of its preliminary analysis. See Final Decision Memo at 11–14, 21–23, 26–28. With respect to RINs, Commerce abandoned its reliance on the circumstances of sale provision, invoking instead 19 C.F.R. § 351.401(c) (2015),[5] which provides that Commerce "normally will use a price that is net of price adjustments, as defined in § 351.102(b)." Continuing to find that U.S. sales prices contained embedded RIN adjustments, Commerce adjusted normal value to remove those embedded costs. Id. at 12.

As for its PMS findings, Commerce continued to disregard home market biodiesel prices, due to the GOA's pervasive involvement in the market, relying instead on constructed value. Final Decision Memo at 16–18. Further, Commerce continued to find

---

[4] Commerce noted that it valued the RINs using information submitted by the petitioner and compiled by third-party sources. Prelim. Decision Memo at 30. Commerce did so because, except for the RIN values associated with LDC Argentina's constructed export price sales, the respondents were unable to estimate RIN values, as they did not participate in the RIN creation process upon the biodiesel's importation. Id. LDC Argentina, for its constructed export sales, reported estimated RIN values based on its knowledge of RIN values because the biodiesel was imported by a U.S. affiliate. Commerce noted that the RIN values submitted by petitioner were nearly identical to those used by LDC Argentina to estimate RIN values for its constructed export price sales. Id.

[5] Further citations to the Code of Federal Regulations are to the 2015 edition.

that a PMS warranted disregarding the reported soybean prices in Argentina, relying

instead on market-determined soybean prices to calculate constructed value.  Id. at 21–

23.  Commerce reasoned that the GOA's intervention in soybean pricing through the use

of an export tax regime renders the prices respondents paid for soybeans outside the

ordinary course of trade.  Id. at 21.  In accordance with its findings, Commerce calculated

final weighted-average ADD rates of 86.41% for Vicentin Group and 60.44% for LDC

Argentina.  Final Results, 83 Fed. Reg. at 8,838.

Vicentin commenced the present action on May 15, 2018.  See Summons, May

15, 2018, ECF No. 1; Compl., May 16, 2018, ECF No. 7.  On June 13, 2018, the court

issued an order allowing NBB Fair Trade Coalition—the petitioner in the administrative

proceeding below—to intervene as a defendant-intervenor.  See Order, June 13, 2018,

ECF No. 15.   On July 20, 2018, the court granted a motion to consolidate an action

brought by LDC Argentina under this case.[6]  See Memorandum and Order, July 20, 2018,

ECF No. 18.  The court held oral argument on July 12, 2019.  See Appearance Sheet,

July 15, 2019, ECF No. 61.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C.

§ 1581(c) (2012), which grant the court authority to review actions contesting the final

determination in an ADD investigation.  The court "shall hold unlawful any determination,

---

[6] The court's order consolidated Vicentin S.A.I.C. v. United States, Court No. 18-00111 and LDC
Argentina S.A. v. United States, Court No. 18-00119 under the present action.  See Memorandum
and Order, July 20, 2018, ECF No. 18.  The court's order also denied a motion to consolidate
Vicentin S.A.I.C. & Gov't of Argentina v. United States, Consol. Court No. 18-00009—a challenge
to Commerce's final determination in the countervailing duty investigation of biodiesel from
Argentina brought by Vicentin S.A.I.C. and the Government of Argentina—with the above two
cases.  See id.

finding or conclusion found . . . to be unsupported by substantial evidence on the record,

or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.  Commerce's Adjustment to Constructed Value for an Estimated Value of RINs

In the final determination Commerce applied an adjustment to normal value—in

this case, constructed value—by an estimated value for RINs to account for a perceived

imbalance between normal value and respondents' U.S. sales prices.  See Final Decision

Memo at 11–14.  Vicentin and LDC Argentina argue that Commerce's determination is

unlawful and unsupported by substantial evidence.  See Pls.' Br. at 1–2, 7–20; Consol.

Pl.'s Br. at 8, 10–21.  Defendant counters that Commerce's conclusion is in accordance

with law and supported by substantial evidence.  Def.'s Br. at 7, 15–29.  As explained

below, the legal basis for Commerce's determination is not clear, and therefore the issue

must be remanded for further consideration or explanation.

Where Commerce determines that merchandise is being sold at less than fair

value and the International Trade Commission determines that a domestic industry is

materially injured or threatened with material injury, Commerce imposes an ADD.  See

19 U.S.C. § 1673.  To determine whether subject merchandise is being sold at less than

fair value, Commerce makes "a fair comparison . . . between the export price or

constructed export price and normal value."[7]   19 U.S.C. § 1677b(a).   The statute

describes normal value as

---

[7] Further, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") acknowledges that to achieve the "fair comparison" of export price to normal value

(footnote continued)

the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price . . . .

19 U.S.C. §§ 1677b(a)(1)(A), (B)(i).

Similarly, 19 U.S.C. § 1677a provides that export price refers to

the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States . . . .

19 U.S.C. § 1677a(a).  Where Commerce determines that home-market sales prices or third-country sales prices should not be used to determine normal value, Commerce uses constructed value as a basis for normal value.[8]  See 19 U.S.C. § 1677b(a)(4); see also Prelim. Decision Memo at 21–23.

In the final determination, Commerce used constructed value as normal value and then adjusted normal value to account for RINs.  Final Decision Memo at 11–14.  It appears there may be two sources of statutory authority upon which Commerce might

---

required by 19 U.S.C. § 1677b(a), § 1677b "provides for the selection and adjustment of normal value to avoid or adjust for differences between sales which affect price comparability."  SAA, H.R. Doc. 103-316, at 820 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4161.  Indeed, the statute generally "seek[s] to produce a fair 'apples to apples' comparison between foreign market value and [U.S.] price," which requires "adjustments to the base value of both foreign market value and [U.S.] price to permit comparison of the two prices at a similar point in the chain of commerce." Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995).

[8] Constructed value consists of (1) the cost of materials and fabrication or other processing of any kind used to produce the merchandise; (2) the actual amounts incurred and realized by the exporter or producer being examined for selling, general, and administrative expenses, and profits, tied to the production and sale of the goods; and (3) the cost of packing the merchandise for shipment to the United States.  See 19 U.S.C. 1677b(e).  If Commerce determines that "a [PMS] exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade," Commerce "may use another calculation methodology under this part or any other calculation methodology."  19 U.S.C. § 1677b(e).

have relied to adjust normal value to account for the value of RINs.  First, Commerce seems to indicate in the final determination that it may adjust an identified value in order to establish "the price at which" the foreign like product or subject merchandise "is first sold."  See Final Decision Memo at 11; see also 19 U.S.C. §§ 1677b(a)(1)(A), (B)(i) and 19 U.S.C. § 1677a(a).  Under this approach, Commerce seemingly views its regulations as providing authority to adjust normal value; 19 C.F.R. § 351.401(c) provides that when "calculating export price, constructed export price, and normal value (where normal value is based on price), the Secretary normally will use a price that is net of price adjustments, as defined in § 351.102(b), that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable)."  Adjustments identified in § 351.102(b) mean "a change in the price charged for subject merchandise or the foreign like product, such as a discount, rebate, or other adjustment, including, under certain circumstances, a change that is made after the time of sale (see § 351.401(c)), that is reflected in the purchaser's net outlay."  19 C.F.R. § 351.102(b)(38).

Commerce appears to consider 19 U.S.C. §§ 1677b(a)(1)(A), (B)(i) and 19 U.S.C. § 1677a(a)—calling for Commerce to use "the price at which" the foreign like product or the subject merchandise "is first sold"—as empowering it by virtue of 19 C.F.R. § 351.401(c) to adjust normal value to neutralize an embedded adjustment in export price. See Final Decision Memo at 11 (explaining that these provisions state that in determining export price or normal value, "Commerce begins with the price at which the subject merchandise or foreign like product is first sold (i.e., the basis 'starting price')").[9]  Under

---

[9] Commerce cites 19 U.S.C. § 1677b(a)(1)(A), (B)(i) and 19 U.S.C. § 1677a(a), both of which contain the language "the price" at which the product "is first sold."  See Final Decision Memo at 11.

this reading, the RIN value constitutes a price adjustment under 19 C.F.R. § 351.102(b), and because 19 C.F.R. § 351.401(c) calls for Commerce to use an export price net of adjustments, Commerce seems to believe it can neutralize an embedded RIN adjustment.

Secondly, Commerce adjusts normal value pursuant to 19 U.S.C. § 1677b(a)(6) – (8). Specifically, 19 U.S.C. § 1677b(a)(6)–(7) provide for adjustments to normal value to account for various costs and expenses, including, inter alia, the cost of containers, shipment, taxes, differences in the quantities in which the goods are sold in the United States and foreign market, and differences in the circumstances of sale. Moreover, 19 U.S.C. § 1677b(a)(8) provides for adjustments to constructed value as appropriate. Commerce has clarified by regulation how it makes adjustments under these sections. For example, Commerce has explained that circumstances of sale adjustments shall generally only be made for direct selling expenses. 19 C.F.R. § 351.410(b).

Commerce seems to consider starting price adjustments under 19 U.S.C. §§ 1677b(a)(1)(A), (B)(i), 19 U.S.C. § 1677a(a), and 19 C.F.R. § 351.401(c) as distinct from adjustments contained in 19 U.S.C. §§ 1677b(a)(6)–(8). In promulgating 19 C.F.R. § 351.401, Commerce responded to a comment contending that the regulation contradicted 19 U.S.C. § 1677b(a)(6)(C)(iii), which provides for circumstances of sale adjustments:

> The Department disagrees with the commenter's argument that the Department's proposed modifications to 19 CFR 351.102(b)(38) and 19 CFR 351.401(c) are inconsistent with the statute. As an initial matter, the commenter argues that these modifications are inconsistent with [19 U.S.C. § 1677b(a)(6)(C)(iii)], which states that normal value shall be increased or decreased by the amount of any difference between export price (or constructed export price) and normal value established to the Department's satisfaction to be due to differences in the circumstances of sale. However, the statutory basis for the price adjustments addressed in 19 CFR 351.102(b)(38) and 19 CFR 351.401(c) is not [19 U.S.C.

§ 1677b(a)(6)(C)(iii)] of the Act, but rather, is found in [19 U.S.C. § 1677a(a)] and [§ 1677b(a)(1)(B)(i)], which provide that in determining export price or normal value the Department begins with the price at which the subject merchandise or foreign like product is first sold—in other words, the basic "starting price" provisions.

Modification of Regulations Regarding Price Adjustments in [ADD] Proceedings, 81 Fed.

Reg. 15,641, 15,644 (Dep't Commerce Mar. 24, 2016).

Here, it is not clear under what statutory authority Commerce adjusted normal value to account for RINs.[10]   In its final determination, Commerce invoked 19 C.F.R. § 351.401(c) in making the adjustment to normal value.  Final Decision Memo at 11–12. Commerce found that "the gross or starting prices reported . . . for U.S. sales of biodiesel are reflective of an upward adjustment for RIN values," and thus such prices were not "net of price adjustments."  Final Decision Memo at 12; see also 19 C.F.R. § 351.401(c). Perhaps Commerce believes that in identifying "the price at which" the foreign like product or subject merchandise "is first sold" pursuant to 19 U.S.C. §§ 1677b(a)(1)(A), it may

---

[10] Commerce invoked the "fair comparison" language of 19 U.S.C. § 1677b(a) and noted that to compare U.S. price and normal value on an "apples to apples" basis, it needed to make an adjustment to account for the embedded RIN value.  See Final Decision Memo at 11, 13; see also Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995).  In addition to citing 19 U.S.C. § 1677a(a)'s "fair comparison" language, Commerce references the SAA's statement that to achieve such fair comparison, § 1677b provides for "the selection and adjustment of normal value to avoid or adjust for differences between sales which affect price comparability."  Final Decision Memo at 11 (citing SAA, H.R. Doc. 103-316, at 820 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4161).  However, Commerce does not offer a clear explanation of the precise statutory authority upon which it relied.

adjust normal value[11] to account for embedded values in the export price.[12]   Indeed,

Commerce's reference to 19 C.F.R. § 351.401(c) suggests that it adjusted normal value

for RINs in order to determine the price at which merchandise is first sold in the United

States.   See Final Decision Memo at 11–12.   However, even if it were reasonably

discernable that Commerce relied upon 19 C.F.R. § 351.401(c) to offset an embedded

RIN adjustment, Commerce has not explained why it can adjust the normal value[13] as

opposed to the U.S. price.[14]

    Unlike Commerce, Defendant invokes 19 U.S.C. § 1677b(a)(8), which states that

constructed value "may be adjusted, as appropriate, pursuant to this subsection," as a

source of authority for Commerce's adjustment to normal value for RINs.   See Def.'s Br.

---

[11] Vicentin and LDC Argentina argue that Commerce lacks authority under the statute and regulations to make such an adjustment to constructed value.   Pls.' Br. at 9–17; Consol. Pl.'s Br. at 12–14.   The regulation Commerce cited, 19 C.F.R. § 351.401(c), states in relevant part that "[i]n calculating . . . normal value (where normal value is based on price), the Secretary normally will use a price that is net of price adjustments, as defined in § 351.102(b), that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable)." Vicentin contends that the qualifying language in parentheses, "where normal value is based on price," indicates that the subsequent language applies to calculations of normal value only where Commerce determines normal value based on price, and Commerce did not do so here.   Because Commerce's determination to adjust normal value for RINs is remanded, the court declines to rule on the issue.

[12] Here, the RINs create a value in the United States that Commerce considers an embedded adjustment.   Presumably, such an embedded adjustment could arise in the foreign market or third country market.

[13] Commerce explains why it would rather adjust normal value as opposed to the U.S. price.   See Final Decision Memo at 12 (explaining that "by not affecting the U.S. sales denominator, an addition to [normal value] results in a dumping margin based on a denominator that is proportional to entered value, which is inclusive of the RIN markup").   Commerce's preference for adjusting normal value does not substitute, however, for a clear explanation of its authority to do so.

[14] LDC Argentina suggests that Commerce should have deducted "the actual expenses related to RINs" from U.S. prices, rather than adjusting normal value for RINs.   See Consol. Pl.'s Br. at 20–21 (contending that in contrast to the estimated RIN values for U.S. sales, the selling expenses "related to RINs-eligibility are known and have been quantified and verified").   Because Commerce has not provided a clear explanation of the statutory authority upon which it relied, the court does not reach the issue, and declines to comment on precisely what steps Commerce should take on remand.

at 18–19.  It does so after citing Commerce's authority to make a "fair comparison" under

19 U.S.C. § 1677b(a) generally and referencing 19 C.F.R. § 351.401(c).[15]  Id. at 17–18.

Defendant may consider an adjustment under 19 C.F.R. § 351.401(c) to be an

"appropriate adjustment" pursuant to 19 U.S.C. § 1677b(a)(8).  Or, Defendant may

believe—as it appears Commerce does—that 19 U.S.C. § 1677b(a)(1)(B)(i) implicitly

grants Commerce the authority to adjust a price to account for embedded values in the

price, in order to identify "the price at which the foreign like product is first sold."[16]

Nevertheless, Commerce's explanation regarding its authority to adjust normal

value for RINs is incomplete.  Commerce must clearly ground its determination in the

statute.  See, e.g., CS Wind Vietnam Co., Ltd. v. United States, 832 F.3d 1367, 1376

(Fed. Cir. 2016) (stating that Commerce "must reasonably tie the determination under

review to the governing statutory standard and to the record evidence by indicating what

statutory interpretations the agency is adopting and what facts the agency is finding").  It

is unclear upon which of the potential statutory grants of authority Commerce relies, and

---

[15] Plaintiff also asserts that the "fair comparison" language in 19 U.S.C. § 1677b(a) does not provide an independent basis for Commerce to make an adjustment to constructed value for an estimated RIN value, and thus the adjustment was unlawful. Pls.' Br. at 16–17. It is not clear whether Commerce or Defendant relies on the "fair comparison" language in 19 U.S.C. § 1677b(a) as its statutory basis for its adjustment.

[16] Vicentin argues that 19 U.S.C. §1677b(a)(8) does not provide authority for Commerce to adjust constructed value for RINs, as "[t]he language and structure of the provision, and the way that it fits in the overall statute, contradict" such a claim. Pls.' Reply Br. Supp. Mot. J. Agency R. at 3, May 10, 2019, ECF No. 43. Vicentin contends that Commerce's authority to make adjustments to constructed value derive "from one of the explicitly statutory provisions denoting the adjustments," and "none of the specific adjustments allowed under [§] 1677b(a) authorizes the U.S. RIN value adjustment." Id. at 3–4. LDC Argentina similarly argues that § 1677b(a)(8) does not authorize the adjustment Commerce made for RINs, as "[t]he components required to calculate constructed value identified in subsection (e) do not provide the statutory authority for the adjustment." Reply Supp. Consol. Pl.'s Rule 56.2 Mot. J. Agency R. at 3, May 10, 2019, ECF No. 45. It is unclear whether Commerce relies upon 19 U.S.C. § 1677b(a)(8) as it does not cite that provision; therefore, the court does not address these arguments.

the court declines to speculate.  <u>See</u> <u>Secs. & Exch. Comm'n v. Chenery Corp.</u>, 332 U.S.

194, 196–97 (1947) (explaining that the basis for agency action "must be set forth with

such clarity as to be understandable," and that a reviewing court may not guess at the

agency's theory, nor can it "be expected to chisel that which must be precise from what

the agency has left vague and indecisive").   Commerce's invocation of 19 U.S.C.

§§ 1677b(a)(1)(B)(i) and 19 C.F.R. § 351.401(c) does not address why it is permitted to

adjust normal value to account for an embedded price adjustment in the U.S. price.

Defendant's explanation of Commerce's determination undercuts Commerce's position

by proffering 19 U.S.C. § 1677b(a)(8) as the basis for Commerce's determination despite

Commerce failing to invoke § 1677b(a)(8) in the final determination.  <u>See</u> <u>Chenery Corp.</u>,

332 U.S. at 196 (explaining that a reviewing court may uphold agency action "solely by

the grounds invoked by the agency," and that if such grounds are inadequate, "the court

is powerless to affirm the administrative action by substituting what it considers to be a

more adequate or proper basis"). In light of Commerce's failure to clearly explain the

statutory authority empowering it to adjust normal value for RIN values, as well as the

inconsistency between Commerce's explanation of its authority and that offered by

Defendant, the court remands Commerce's determination for further consideration or

explanation.

## II.  Commerce's Adjustment for a PMS

Vincentin and LDC Argentina challenge as both contrary to law and unsupported by

substantial evidence Commerce's decision to disregard soybean prices in calculating

constructed value.  Pls.' Br. at 20–38; Consol. Pl.'s Br. at 10–21.  In particular, Vincentin

argues that the statute, as well as Commerce's practice, require that Commerce base

constructed value on costs in the country of manufacture.  Pls.' Br. at 20–24.  Further,

Vicentin and LDC Argentina argue that the effect of Commerce's PMS finding amounts

to a double remedy, which is both contrary to law and not supported by substantial

evidence.  Pls.' Br. at 38–46; Consol. Pl.'s Br. at 21–24.  Finally, Vicentin argues that

Commerce's determination is unsupported by substantial evidence because Vicentin's

reported costs reasonably reflect the costs of manufacture, Commerce's chosen costs do

not reasonably reflect the costs of manufacture, and Commerce's determination that

Vicentin's costs are distorted is unsupported by the record.  Id. at 28–38.  Defendant

argues in response that Commerce's PMS finding regarding soybean prices in Argentina

is supported by substantial evidence and lawful.  Def.'s Br. at 27–43.  As explained below,

although the statute grants Commerce considerable discretion in choosing

methodologies to account for a PMS and Commerce relies upon sufficient record

evidence of distortion in the Argentine soybean market, Commerce fails to explain why

its methodology is reasonable in light of its CVD determination.

### A. Commerce's Rejection of Argentine Soybean Prices Is Lawful.

As discussed, dumping determinations require a comparison between normal

value and export price or constructed export price.  19 U.S.C. § 1677b(a).  Normal value

may be based upon home market sales made in the ordinary course of trade, third-country

sales, or constructed value.  See 19 U.S.C. §§ 1677b(a)(1)(B), (a)(4).  Commerce

determines normal value based upon constructed value, rather than home market sales,

where a PMS exists that prevents a proper comparison with the export price or

constructed export because such sales occurred outside the ordinary course of trade.[17]

See 19 U.S.C § 1677b(a)(4); see also Prelim. Decision Memo at 21–23.  The phrase

"ordinary course of trade" means "the conditions and practices which, for a reasonable

time prior to the exportation of the subject merchandise, have been normal in the trade

under consideration with respect to merchandise of the same class or kind." 19 U.S.C

§ 1677(15).[18]  Constructed value equals the cost of materials and fabrication or other

processing, plus an amount for selling, general, and administrative expenses, as well as

an amount for profit.  See 19 U.S.C § 1677b(e).  The statute provides that the presence

---

[17] The statute envisions two ways in which a PMS may affect Commerce's analysis.  First, Commerce may use third country sales as normal value (rather than the price at which the merchandise sells in the home market) or possibly constructed value, when it finds the existence of a PMS.  19 U.S.C. §§ 1677b(a)(1)(B)(1)(i)(C)(iii); 19 U.S.C. § 1677(15).  Second, where Commerce uses constructed value under 19 U.S.C. § 1677b(e), it may opt to use any other calculation methodology "if a [PMS] exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade."  19 U.S.C.  § 1677b(e).

In the first instance, neither, 19 U.S.C. §§ 1677b(a)(1)(B) nor (C) define "particular market situation" except to say that the PMS "prevents a proper comparison with the export price or constructed export price."  However, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA") provides that a PMS may exist "where there is government control over pricing to such an extent that home market prices cannot be considered competitively set."  SAA, H.R. Doc. 103-316, at 822 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4162.

In the second instance, more specifically, when providing for constructed value, the Trade Preferences Extension Act of 2015 ("TPEA") amended 19 U.S.C. § 1677b(e) to provide

> For purposes of paragraph (1), if a [PMS] exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this part or any other calculation methodology.

19 U.S.C.  § 1677b(e).

[18] The TPEA integrated the PMS concept to 19 U.S.C. § 1677(15)'s definition of sales and transactions made outside the "ordinary course of trade."  "Sales and transactions" are made "outside the ordinary course of trade" where Commerce finds that "the [PMS] prevents a proper comparison with the export price or constructed export price."  19 U.S.C. § 1677(15).

of a PMS may permit Commerce to deviate from the typical methodology for determining

constructed value:

> For purposes of paragraph (1), if a [PMS] exists such that the cost of
> materials and fabrication or other processing of any kind does not
> accurately reflect the cost of production in the ordinary course of trade, the
> administering authority may use another calculation methodology under this
> part or any other calculation methodology.

19 U.S.C. § 1677b(e).  The statute therefore does not direct Commerce to a particular

calculation methodology where Commerce uses constructed value and finds a PMS.[19]

Rather, it directs Commerce to use "another calculation methodology under this part or

any other calculation methodology."  Id.

       Vicentin's challenge that Commerce is required to construct a value using costs

incurred in Argentina must fail.[20]  The statute does not require that Commerce construct

a value using costs from the exporting country.[21]  As described, the statute provides that

---

[19] Congress was more specific in other sections. For example, the statute acknowledges that in
some cases the subject merchandise might not be sold in the exporting country, in which case
Commerce may use the prices at which the merchandise is sold in a different country, where
certain conditions are satisfied.  See 19 U.S.C. §§ 1677b(a)(1)(B)(ii), (C)(i). Similarly, the statute
permits the same method where Commerce determines that the subject merchandise is not sold
in sufficient quantity in the exporting country.  See 19 U.S.C. §§ 1677b(a)(1)(B)(ii), (C)(ii).

[20] Commerce made two PMS determinations in this case.  First, Commerce found that the GOA
controlled domestic biodiesel sales such that home market sales could not be considered to be
sales in the ordinary course of trade. Final Decision Memo at 16–18.  Commerce relies upon this
finding to resort to constructed value rather than basing normal value on sales in the country of
exportation.  Neither Vicentin nor LDC Argentina challenges Commerce's determination regarding
the use of constructed value.   Second, Commerce found that a PMS exists with regard to the
domestic soybean prices, and therefore substituted Argentine soybean costs for market
determined soybean prices.

[21] Vicentin urges the court to consider the WTO determination on biodiesel as "meaningful
guidance" supporting the principle that Commerce should limit costs considered for constructed
value to those in the country of manufacture. Pls.' Br. at 27 (citing European Union – Antidumping
Measures on Biodiesel from Argentina, WT/DS473/ABR, at Paras. 6.81 and 6.83 (June 10,
2016)).  As Commerce noted, decisions of the WTO are not controlling of issues before this court.
See Final Decision Memo at 23; see also Timken Co. v. United States, 354 F.3d 1334, 1344 (Fed.
Cir. 2004) (explaining that WTO decisions are "not binding on the United States, much less this
court").

constructed value equals the cost of materials and fabrication or other processing, plus

an amount for selling, general, and administrative expenses, and for profit, plus the cost

of packing and shipping to the United States.  <u>See</u> 19 U.S.C § 1677b(e).  And when

Commerce finds that a PMS exists, it "may use . . . any other calculation methodology."

<u>Id.</u>  The language is simply not as restrictive as Vicentin contends.[22]  Indeed, Vicentin

concedes that "the constructed value subsection does not itself explicitly state that the

cost of materials be the cost of materials in the exporting country."  Pls.' Br. at 21.

Vicentin would have the court read in such a restriction based upon other language in

the statute that deals with selling, general and administrative expenses, or when a

manufacturer has no sales in a foreign country.  <u>See</u> Pls.' Br. at 21 citing 19 U.S.C.

§ 1677b(e)(2)(A) and 19 U.S.C. § 1677b(e)(2)(B)(i).  The court declines to read in any

such restriction on the broad authority given to Commerce to "use any calculation

methodology" to calculate constructed value where a PMS exists.  19 U.S.C. § 1677b(e).

Although there may be cases where it would be unreasonable to reach beyond costs in

---

[22] Vicentin also argues that even if Vicentin's reported costs did not accurately reflect the cost of production, Commerce remedied any deficiency by indexing Vicentin's costs to incorporate the effects of inflation in Argentina.  Pls.' Br. at 32–33.  The argument is unavailing, given that the inflation adjustment serves a different end.  As Commerce explained, the inflation adjustment is intended to "mitigate the distortions that are logically created when prices rise over 25 percent within a single period."  Final Decision Memo at 34.  Indeed, Commerce "restates the respondent's reported costs in a constant currency basis . . . using monthly inflation indices and then calculates the period average [costs of production] and [constructed values]," in an effort to "neutralize the impact of inflation on the calculation of the annual average costs."  <u>Id.</u> at 36.  The inflation indexing thus "does not increase the actual costs reported by the respondent."  <u>Id.</u> at 36–37.  Therefore, although Commerce's indexing methodology mitigates distortions caused by severe inflation within a period, it is not redundant with Commerce's adjustment for the PMS.

the exporting country for constructed value, the court cannot say that doing so is precluded as a matter of law.[23]

### B.  Commerce's PMS Finding Is Lawful.

Nor can the court conclude that Commerce's determination to resort to market-determined prices for soybeans based on the existence of a PMS is contrary to law on the ground that allowing for such an adjustment would constitute a double remedy.  Pls.' Br. at 38–46; Consol. Pl.'s Br. at 8, 21–24.  The statute directs Commerce to make "a fair comparison" between "the export price or constructed export price and normal value."  19 U.S.C.A. § 1677b(a).  As discussed, Commerce determines normal value based upon constructed value, rather than home market sales or third country sales, where a PMS exists that prevents a proper comparison with the export price or constructed export because such sales occurred outside the ordinary course of trade.  See Prelim. Decision Memo at 22 (explaining that "it is appropriate to follow our long-standing practice of turning to [constructed value] when there are no sales within the ordinary course of trade in the home market"); 19 U.S.C. § 1677(15); see also 19 U.S.C § 1677b(a)(4).  The statute provides that where a PMS exists, Commerce may deviate from the typical methodology for determining constructed value and may use "any other calculation methodology."  19 U.S.C. § 1677b(e).

---

[23] Vicentin also argues that Commerce's decision to reach beyond the Argentine market to construct value contravenes practice, see Pls.' Br. at 23, but the argument is unavailing.  Vicentin quotes several sections from Commerce's Antidumping Procedures Manual that purportedly support Vicentin's position, but none of these guidelines prohibit using costs from outside the country of manufacture when calculating constructed value.  Moreover, Vicentin does not point to a single case demonstrating Commerce's alleged practice.  Instead, Vicentin avers that it can find no case where Commerce used manufacturing costs outside the country of manufacturer, see Pls.' Br. at 23-24, but such an observation is insufficient to establish a controlling practice where, as here, Commerce found a PMS that distorts the entire market.

The statute therefore authorizes Commerce to use another calculation methodology if it finds that a PMS "exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade," 19 U.S.C. § 1677b(e).  Here, Commerce determined that, in order to make a fair comparison between constructed value and export price, it needed to rely on market-determined soybean prices rather than domestic soybean purchase prices.  Such an adjustment falls within the broad ambit of "another calculation methodology under this part or any other calculation methodology" in the presence of a PMS, and thus Commerce's determination is not precluded as a matter of law.  See 19 U.S.C. § 1677b.

The statute does not prohibit Commerce's determination in this case, as argued by Vicentin and LDC Argentina.  See Pls.' Br. at 41–43; Consol. Pl.'s Br. at 23.  Vicentin contends that the "fair comparison" language in 19 U.S.C. § 1677b(a) "has been explicitly recognized as including a commitment to avoid double counting."[24]  Pls.' Br. at 41–42.  In

---

[24] Vicentin also cites several decisions by the Court of Appeals for the Federal Circuit and this court, arguing that these cases demonstrate that the statute prohibits Commerce from making the type of adjustment it made here.  See Pls.' Br. at 43 (citing Micron Tech., Inc. v. United States, 243 F.3d 1301 (Fed. Cir. 2001); Maverick Tube Corp. v. Toscelik Profil ve Sac Endustrisi A.S., 861 F.3d 1269 (Fed Cir. 2017); & Mitsubishi Heavy Industries v. United States, 23 CIT 326, 331, 54 F. Supp. 2d 1183, 1189 (1999)).  Vicentin's argument is unpersuasive.  First, none of these cases addressed an alleged double remedy across different proceedings, as is the case here.  Second, an examination of the facts of these cases quickly reveals that the cases are distinguishable from the present case.  For example, in Mitsubishi, this court upheld Commerce's decision to deduct imputed credit expenses from constructed value.  23 CIT at 331, 54 F. Supp. 2d at 1189.  The court explained that "Commerce made the same assumption for U.S. sales in deducting imputed credit expenses from [constructed export price], the U.S. sales price.  Thus, Commerce's decision to adjust both [constructed value] and [constructed export price] for imputed credit expenses was reasonable in order to ensure a fair comparison."  23 CIT at 332, 54. F. Supp. 2d at 1189.  The court therefore directed its reference to the "fair comparison" language at

(footnote continued)

support, Vicentin relies on the SAA's discussion of normal value, which states that "[w]ith respect to each of these adjustments [to normal value], as well as with all other adjustments, Commerce will ensure that there is no overlap or double counting of adjustments." SAA, H.R. Doc. 103-316, at 828 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4167. Vicentin's argument is unpersuasive. Vicentin quotes the SAA's discussion pertaining to adjustments to normal value pursuant to 19 U.S.C. § 1677b(a)(6)(C), "as well as with all other adjustments." See id.; see also Pls.' Br. at 41–42. The SAA's discussion of "double-counting of adjustments" refers to adjustments made within a single proceeding to arrive at a price-to-price comparison of normal value and export price. This construction is supported by the fact that the section quoted falls under the broader "Price-to-Price Comparisons" section of the SAA. See SAA, H.R. Doc. 103-316, at 821 (1994),

---

the comparison of normal value to export price. The same is true of Micron Tech., Inc., a case in which the Court of Appeals held, inter alia, that 19 U.S.C. § 1677a(d)(1)(D) is ambiguous regarding the scope of the indirect selling expenses to be deducted when determining constructed export price, and that Commerce's interpretation—that the scope of expenses to be deducted under the subsection is limited to those expenses incurred in connection with a sale in the United States"—was reasonable. 243 F.3d at 1308–1314. Thus, apart from standing for the basic proposition that the purpose of the adjustments provided for in the antidumping statute is to achieve a fair comparison between normal value and U.S. price, it is unclear how Micron Tech., Inc. relates to the case at hand. Finally, in Maverick Tube Corp., the Court of Appeals held that 19 U.S.C. § 1677a(c)(1)(B), which authorizes Commerce to increase the export price and constructed export price by the amount of any duty drawbacks, is unclear regarding "whether duty drawback adjustments are only available to offset duties on potential inputs for subject merchandise," and that Commerce's construction of this subsection—that duty drawback adjustments are unavailable "when the exempted goods could not be used as inputs to produce the subject merchandise"—was reasonable. 861 F.3d at 1272–74. These cases are thus inapposite with respect to the issue before the court, i.e., whether Commerce may adjust constructed value pursuant to its PMS finding where that finding has a basis similar to that of Commerce's concurrent CVD determination.

reprinted in 1994 U.S.C.C.A.N. 4040, 4161.  Vicentin attempts to recast this language to apply across proceedings, a construction that is not supported by the statute or the SAA.[25]

Moreover, the statute's silence on whether to account for remedies imposed in CVD proceedings when adjusting for a PMS stands in stark contrast with other situations in which Congress expressly directed Commerce to avoid potential double remedies.  For example, 19 U.S.C. § 1677a(c)(1)(C) provides that Commerce must avoid double counting CVD rates used to offset export subsidies when determining export price and constructed export price.  See 19 U.S.C. § 1677a(c)(1)(C).  Additionally, Congress directed Commerce to offset ADD margins for merchandise from a non-market economy ("NME") by the amount that a countervailable subsidy, coupled with Commerce's determination of normal value (based on factors of production), resulted in an increase in the ADD, to the extent that such an increase can be reasonably estimated.  See 19 U.S.C. § 1677f-1(f); see also 19 U.S.C. § 1677b(c).  Congress added this provision in response to the Court of Appeals for the Federal Circuit's decision in GPX Int'l Tire Corp. v. United States, 666 F.3d 732 (Fed. Cir. 2011), a case in which two Chinese tire manufacturers

---

[25] Vicentin also argues that Commerce's decision in this case contravenes Commerce's practice of avoiding double-counting of antidumping and countervailing duties.  Pls.' Br. at 44.  The argument is unavailing.  Vicentin cites a single determination, Certain Cut-to-Length Carbon Steel Plate from Germany, which is inapposite.  62 Fed. Reg. 18,390 (Dep't Commerce Apr. 15, 1997).  There, the petitioners urged Commerce to deduct antidumping and countervailing duties from the price used to determine export price or constructed export price, arguing that such duties should be considered "United States import duties" for purposes of 19 U.S.C. § 1677a(c)(2)(A).  Certain Cut-to-Length Carbon Steel Plate from Germany, 62 Fed. Reg. at 18,394.  Commerce declined to do so, explaining that antidumping and countervailing duties "are not a cost" within the meaning of the statute, and that they "cannot be part of the very calculation from which they are derived."  Id. at 18,395.  Commerce noted that the treatment of antidumping and countervailing duties "as a cost to be deducted from the export price is an issue that was arduously debated during passage of the URAA and ultimately rejected by Congress."  Id.  Here, by contrast, the issue is not whether Commerce should deduct a CVD from the export price in an ADD proceeding, but whether Commerce may adjust domestic soybean costs in determining constructed value due to a PMS when the basis for that PMS appears to have been the same basis upon which Commerce imposed CVDs on biodiesel from Argentina.

challenged Commerce's affirmative countervailing duty ("CVD") determination, arguing

that Commerce could not impose CVDs with respect to China, an NME. Id. at 736.  The

Court of Appeals found for the manufacturers, holding that CVDs could not be applied to

goods from NME countries.  Id. at 745.  Shortly after the Court of Appeals issued its

decision in GPX, Congress enacted legislation overruling the decision.  See Application

of [CVD] Provisions to [NME] Countries, Pub. L. No. 112–99, § 1, 126 Stat. 265, 265

(2012).  The new law authorized Commerce to impose CVDs on importers from NME

countries, and included what became codified as 19 U.S.C. § 1677f-1(f)—described

above—directing Commerce to "reduce the [ADD] [applied to NME imports] by the

amount of the increase in the weighted average dumping margin estimated by

[Commerce] [to result from the imposition of CVDs]."[26]  Application of [CVD] Provisions

to [NME] Countries, Pub. L. No. 112–99, § 2(a), 126 Stat. 265, 266 (2012); see also

Guangdong Wireking Housewares & Hardware Co., Ltd. v. United States, 745 F.3d 1194,

1197 (Fed. Cir. 2014) (explaining that "the new law instructs Commerce to reduce the

duties applied to NME imports when the antidumping and countervailing duties imposed

on those goods double count for the same unfair trade advantage.").  As Commerce

points out, Final Decision Memo at 27, three years later Congress enacted the TPEA,

---

[26] Commerce has previously noted that for domestic subsidies in a market economy investigation, the subsidy presumably lowers both the normal value and export price and therefore has no effect on a dumping analysis such that a danger of double counting arises.  See Low Enriched Uranium From France, 69 Fed. Reg. 46,501, 46,506 (Dep't Commerce Aug. 3, 2004) (notice of final results of [ADD] administrative review).  Both the NME context and the export subsidy context raise the danger, however, of double counting.  In NME cases, normal value is constructed based on surrogate values for factors of production, see 19 U.S.C. § 1677b(c), and thus the domestic subsidy is not embedded in the price used as normal value.  Consequently, the subsidy could potentially be remedied both by the CVD and by the ADD.  For an export subsidy, the subsidy by definition only affects the export price.  Thus, Congress required that Commerce offset the subsidies effect in its antidumping calculation in the case of export subsidies.  See 19 U.S.C. § 1677a(c)(1)(C).

which authorized Commerce to adjust its methodology when determining constructed value where it finds that a PMS exists. See Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, § 504, 129 Stat. 362, 385 (2015). Congress did not reference the potential for a double remedy in this provision. The omission further illustrates the lack of a statutory proscription on the type of adjustment Commerce made here.

### C. Commerce's Determination Is Unsupported by Substantial Evidence.

Vicentin and LDC Argentina argue that Commerce's decision to forgo Argentine soybean prices in favor of market prices is unreasonable on this record because (i) the record lacks substantial evidence that the Argentine prices are in fact distorted, and (ii) Commerce already remedied any distortion by means of its CVD investigation. As discussed below, the argument that the record lacks evidence from which Commerce could reasonably conclude that Argentine soybean prices have been distorted fails. However, Commerce has not explained why its CVD investigation and the resulting CVDs have not remedied the distortion. Unless and until Commerce explains why its CVD investigation does not remedy the distortion found here, its determination that a PMS warrants rejection of Argentine soybean prices is unsupported by substantial evidence.

Vicentin argues that Commerce's finding that a PMS distorts domestic soybean costs is unsupported by the record, but the argument is unpersuasive. To the contrary, Commerce points to considerable record evidence that a PMS exists in Argentina such that the cost of materials does not accurately reflect the cost of production in the ordinary course of trade.[27] Commerce found that "reliable evidence demonstrates that Argentina's

---

[27] Vicentin argues that Commerce inferred a relationship between the export tax regime and the

(footnote continued)

export tax regime impedes external trade and competitive pricing for soybeans."  Final

Decision Memo at 21.  Such evidence led Commerce to maintain its PMS finding in the

final determination, where it noted that "[g]overnment intervention in pricing, such that the

prices can no longer be considered competitively set, is one of the indicators of a PMS

specifically cited in the SAA."  Final Decision Memo at 21.

As Commerce explained in its preliminary determination,[28] the GOA imposes an

export tax of 30% on soybeans, and evidence demonstrates that the tax depresses the

domestic price of soybeans.  Prelim. Decision Memo at 23 (citing Petitioner's PMS

Allegation at 38, Ex. 3, PD 189–198, bar code 3604083-01 (Aug. 2, 2017)).  Specifically,

---

lower biodiesel prices, "even though there was no evidence of such an actual relationship."  Pls.'
Br. at 35.  Vicentin contends that the export tax regime in Argentina did not "actually generate[] a
surplus" of domestic soybeans, citing two studies by the U.S. International Trade Commission
finding that elimination of the export tax would result in a minimal impact on soybean prices in
Argentina.  Pls.' Br. at 35–36.  Vicentin's argument is unpersuasive.  First, Commerce correctly
asserts that the statute requires that Commerce base PMS determination on a finding that "the
cost of materials and fabrication or other processing of any kind does not accurately reflect the
cost of production in the ordinary course of trade."  Final Decision Memo at 21; see also 19 USC
1677b(e).  Commerce's determination, as always, must be supported by substantial evidence.
19 U.S.C. § 1516a(b)(1)(B)(i).  There is no language, however, that would require a causal
analysis between a specific government action and the PMS.  Here, Commerce found that the
cost of soybeans did not accurately reflect the cost of production in the ordinary cost of trade.  As
discussed above, the SAA states that a PMS "might exist . . . where there is government control
over pricing to such an extent that home market prices cannot be considered to be competitively
set."  SAA, H.R. Doc. 103-316, at 822 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4164.  This
SAA provision relates to 19 U.S.C. § 1677b(a)(1)(C)(iii) and therefore pertains to situations in
which Commerce determines to forgo using home market sales in calculating normal value.  In
other words, the SAA section does not pertain to how constructed value is calculated.  With
TPEA's enactment, Congress amended the statute to prescribe how constructed value is
determined, specifying that a PMS exists where "the cost of materials and fabrication or other
processing of any kind does not accurately reflect the cost of production in the ordinary course of
trade."  19 U.S.C. § 1677b(e).

Moreover, to the extent that any causal link is implied by the statute or Commerce's past
practice, Commerce relied upon ample record evidence indicating that the GOA's export tax
regime distorts domestic soybean prices.  See Final Decision Memo at 21; Prelim. Decision Memo
at 23–24.

[28] In the final determination, Commerce references its reasoning in the preliminary determination,
and thus it is reasonably discernible that Commerce incorporates such reasoning with respect to
the evidence supporting its PMS finding.  See Final Decision Memo at 21.

the World Bank described the tax as "lowering the feedstock cost domestically and encouraging exports of biodiesel." Liquid Biofuels: Background Brief for the World Bank Group Energy Sector Strategy [attached as Ex. 20 to Petitioner's PMS Allegation] at 9, PD 189–198, bar code 3604083-04 (Aug. 2, 2017)). Moreover, the OECD explained that the GOA's export tax regime imposes "higher rates for raw materials or input products while lower rates apply for finished products," and that, relatedly, "[t]he price advantage provided to domestic downstream industries can distort and reduce [price] competition in both domestic and foreign markets." The Economic Impact of Export Restrictions on Raw Materials [attached as Ex. 21 to Petitioner's PMS Allegation] at 18, PD 189–198, bar code 3604083-04 (2010). Further, pursuant to the 2013 World Trade Organization Trade Policy Review of Argentina, the WTO Secretariat's report observed that "Argentina considers that export duties are a valid development tool, since they enable many developing countries to cease being mere suppliers of raw materials." World Trade Organization: Trade Policy Review, Report by the Secretariat: Argentina [attached as Ex. 23 to Petitioner's PMS Allegation] at 98, PD 189–198, bar code 3604083-05 (June 14, 2013). Commerce also noted that the United States Trade Representative and the U.S. Department of Agriculture have determined that the GOA's export tax regime, both generally and with respect to soybeans, encourages development and expansion of downstream industries like biodiesel, thus implying that the program results in cheaper domestic soybeans. Prelim. Decision Memo at 23 (citing Petitioner's PMS Allegation at Exs. 24–25, PD 189–198, bar code 3604083-05 (Aug. 2, 2017)). Indeed, as Commerce noted, the regime seemed to have its intended effect—Argentine domestic soybean

prices were almost 40% lower than world prices during the period of review.   Prelim.

Decision Memo at 23.

Although record evidence indicates that the GOA's export tax regime likely distorted

the costs of domestic soybeans, it is unclear why the trade effects of such distortions were

not already remedied by the imposition of CVDs.   In the concurrent CVD investigation of

biodiesel from Argentina, Commerce calculated CVD rates for respondents based on the

export tax regime, which Commerce determined was a countervailable program

described as the "provision of soybeans for less-than-adequate-remuneration (LTAR)

through export restraints."   See Biodiesel From the Republic of Argentina, 82 Fed. Reg.

53,477 (Dep't Commerce Nov. 16, 2017) (final affirmative [CVD] determination) and

accompanying Issues and Decision Mem. for the Final Determination in the [CVD]

Investigation of Biodiesel from the Republic of Argentina at 13, C-357-821, (Nov. 6, 2017),

available at https://enforcement.trade.gov/frn/summary/argentina/2017-24857-1.pdf (last

visited Sep. 5, 2019) ("CVD IDM").   Although the statute contains no prohibition on

imposing CVDs and ADDs in relation to the same conduct, Commerce has failed to

explain, on the current record, why its rejection of Argentine soybean costs—part of its

chosen methodology—is reasonable given that Commerce seems to have remedied the

export tax regime in the CVD determination.

In choosing world market prices over Argentine prices for soybeans, Commerce

found that the PMS in Argentina was such that the price of soybeans did not accurately

reflect the cost of manufacture.   Final Decision Memo at 27.   Commerce explains that the

ADD and CVD proceedings are distinct.   Final Decision Memo at 26; see also Def.'s Br.

at 38 (arguing that "antidumping and countervailing duty investigations are conducted

under two separate statutes and involve individual determinations that are based on independent records").   As explained, however, although Commerce may choose any calculation methodology, 19 U.S.C. § 1677b(e), it is bound by reasonableness.   Both Congress's use of the word "may," as well as principles fundamental to review under the substantial evidence standard require that Commerce's determination be reasonable. 19 U.S.C. § 1677b(e); <u>see also</u> <u>Consol. Edison Co. v. Nat'l Labor Relations Bd.</u>, 305 U.S. 197, 229 (1938) (explaining that substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"); <u>Universal Camera Corp. v. Nat'l Labor Relations Bd.</u>, 340 U.S. 474, 488 (1951) (explaining that substantial evidence "must take into account whatever in the record fairly detracts from its weight"). Given that the subsidies distorting the Argentine soybean market seemingly were remedied in the CVD determination, it is not clear why Commerce should disregard that remedy.   It may be that because the ADD and CVD investigations are distinct proceedings, the remedy provided in the CVD case did not adequately ameliorate the PMS that served as the basis for Commerce's adjustment in this case.   Commerce has not explained, however, why the fact that these are separate proceedings renders the remedy in the CVD proceeding ineffectual with respect to the PMS found here.

Defendant argues that "countervailing and antidumping duty proceedings remedy different behaviors," and that "[j]ust because a product is subsidized does not require companies to also sell the product at less than fair value."   Def.'s Br. at 38 (emphasis omitted).   Defendant's observation does not address the fact that Commerce's CVD

remedy appears to address the same government policy.[29]   Defendant also avers that

"substantial record evidence indicates that a PMS with respect to soybean prices distorted

those prices (and hence the respondents' cost of production) during the period of

investigation.   Thus, comparing the United States [sic] price to a distorted normal value

would not produce a proper comparison."   Def.'s Br. at 39 (internal citations omitted).

Implicit in Defendant's argument is that the PMS has a trade affect that needs to be

remedied.   Defendant fails to explain why the CVD remedy is not sufficient to remedy the

PMS.   Another way of looking at the problem is to consider that the trade effect of the

CVDs imposed will cure the distortion of the Argentine market.   Commerce may have a

reason to believe that the CVDs do not cure the distortion in the Argentine market for

purposes of the ADD investigation.  If Commerce has such a reason, it must explain it.

## CONCLUSION

For the foregoing reasons, Commerce's adjustment to constructed value for an

estimated value of RINs is not supported by substantial evidence.  Commerce's decision

to disregard domestic soybean prices based on the existence of a PMS is in accordance

with law, but on the current record is not supported by substantial evidence.   Accordingly,

it is:

**ORDERED** that Commerce's adjustment to constructed value for an estimated

value for RINs is remanded for further consideration or explanation; and it is further

---

[29] In the CVD investigation, Commerce imposed a CVD, apparently based upon a finding that the GOA's export tax regime artificially decreased Argentine soybean prices, and that the policy met the statutory requirements to constitute a countervailable subsidy.   See CVD IDM at 19–20 (finding that the export tax meets the statutory requirements for a countervailable subsidy "because the export tax constitutes a financial contribution to the respondents in the form of the provision of a good at [less than adequate remuneration]").

**ORDERED** that Commerce's decision to disregard domestic soybean prices based on the existence of a PMS is remanded for further consideration or explanation; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days to file comments on the remand determination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination.


 /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated:  September 10, 2019
        New York, New York