Slip Op. 20-91

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **VICENTIN S.A.I.C. ET AL.,** | |
| **Plaintiffs and Consolidated Plaintiff,** | |
| **v.** | **Before: Claire R. Kelly, Judge** |
| **UNITED STATES,** | **Consol. Court No. 18-00111** |
| **Defendant,** | **PUBLIC VERSION** |
| **and** | |
| **NATIONAL BIODIESEL BOARD FAIR TRADE COALITION,** | |
| **Defendant-Intervenor and Consolidated Defendant-Intervenor.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part Commerce's remand redetermination.]

Dated: July 1, 2020

Daniel L. Porter, Christopher A. Dunn, and Valerie S. Ellis, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for plaintiffs Vicentin S.A.I.C., Oleaginosa Morenos Hermanos S.A., and Molinos Agro S.A. With them on the brief was Kimberly A. Reynolds.

Gregory J. Spak and Jessica Lynd, White & Case LLP, of Washington, DC, for consolidated plaintiff LDC Argentina S.A.

Ann C. Motto, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director. Of Counsel was Emma T. Hunter, Senior

Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Myles S. Getlan, Jack A. Levy, Thomas M. Beline, and Chase J. Dunn, Cassidy Levy Kent (USA) LLP, of Washington, DC, for defendant-intervenor and consolidated defendant-intervenor National Biodiesel Board Fair Trade Coalition.

Kelly, Judge:   Before the court for review is the U.S. Department of Commerce's ("Commerce") remand redetermination pursuant to the court's order in Vicentin S.A.I.C. v. United States, 43 CIT __, 404 F. Supp. 3d 1323, 1343 (2019) ("Vicentin I").  See Final Results of Redetermination Pursuant to Ct. Remand, Jan. 31, 2020, ECF No. 79-1 ("Remand Results").  In Vicentin I, the court remanded for further consideration or explanation Commerce's final determination in the antidumping duty ("ADD") investigation of biodiesel from Argentina.  See Vicentin I, 43 CIT at __, 404 F. Supp. 3d at 1327, 1334, 1343; see also Biodiesel from Argentina, 83 Fed. Reg. 8,837 (Dep't Commerce Mar. 1, 2020) (final determination of sales at less than fair value and final affirmative determination of critical circumstances, in part) ("Final Results") and accompanying Issues and Decisions Memo. for the [Final Results], A-357-820, Feb. 20, 2018, ECF No. 16-5 ("Final Decision Memo").  Specifically, the court ordered Commerce to further consider or explain its adjustment of constructed value by an estimated value for U.S. revenue related to the sale of renewable identification numbers ("RIN"), as well as its finding of a particular market situation ("PMS") that would justify disregarding soybean costs in Argentina. Vicentin I, 43 CIT at __, 404 F. Supp. 3d at 1343.

**PUBLIC VERSION**

On remand, Commerce reconsidered its decision to account for RINs by increasing normal value (in this case constructed value), and instead, accounted for RINs by decreasing export and constructed export price ("U.S. Price").  See Remand Results at 3–16.  Commerce further explained its PMS determination, maintaining that it is not obliged to demonstrate whether the distortion giving rise to the PMS was remedied by a countervailing duty ("CVD") imposed in the companion proceeding, and that there is otherwise no record evidence to support such a finding. See id. at 16–31.  For the following reasons, the court sustains Commerce's decision to account for RINs by adjusting the U.S. Price, but remands Commerce's PMS determination for further explanation or reconsideration.

## BACKGROUND

The court presumes familiarity with the facts of this case, as set out in the previous opinion ordering remand to Commerce, and now recounts the facts relevant to the court's review of the Remand Results.  On March 1, 2018, Commerce published its final determination pursuant to its ADD investigation of biodiesel from Argentina. See Final Results, 83 Fed. Reg. at 8,837.  Commerce selected Vicentin Group[1] and

---

[1] Commerce selected Vicentin S.A.I.C. and examined data from Vicentin and its affiliates, including Oleaginosa Moreno Hermanos S.A. and Molinos Agro S.A.  See Biodiesel From Argentina, 82 Fed. Reg. 50,391, 50,391 n.5 (Dep't Commerce Oct. 31, 2017) (prelim. affirmative determination of sales at less than fair value, prelim. affirmative determination of critical circumstances, in part) ("Prelim. Results") and accompanying Decision Memo. for the [Prelim Results], PD 353, bar code 3632930-01 (Oct. 19, 2017) ("Prelim. Decision Memo").

LDC Argentina S.A ("LDC Argentina" or "LDC") as mandatory respondents.  See

Respondent Selection Memo at 3–5, PD 56, bar code 3568950-01 (May 3, 2017).[2]

Commerce determined normal value by using constructed value after determining

that a PMS in Argentina, arising from the Government of Argentina's ("GOA")

regulatory control over biodiesel prices, rendered home market prices outside the

ordinary course of trade.  See Biodiesel From Argentina, 82 Fed. Reg. 50,391 (Dep't

Commerce Oct. 31, 2017) (prelim. affirmative determination of sales at less than fair

value, prelim. affirmative determination of critical circumstances, in part) ("Prelim.

Results") and accompanying Decision Memo. for the [Prelim Results] at 21–22, PD

353, bar code 3632930-01 (Oct. 19, 2017) ("Prelim. Decision Memo").   When

calculating respondents' dumping margins, Commerce, relying on 19 C.F.R.

§ 351.401(c) (2015),[3] increased the normal value (here, constructed value) of the

---

[2] On June 25, 2018, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination.  These indices are located on the docket at ECF Nos. 16-2–3.  On February 14, 2020, Defendant filed indices to the public and confidential administrative records underlying Commerce's remand redetermination.  These indices are located on the docket at ECF Nos. 80-2–3.  All references to documents from the initial administrative record are identified by the numbers assigned by Commerce in the June 25th indices, see ECF No. 16, and preceded by "PD" or "CD" to denote the public or confidential documents.   All references to the administrative record for the remand determination are identified by the numbers assigned in the February 14th indices, see ECF No. 80, and preceded by "PRR" or "CRR" to denote remand public or confidential documents.

[3] Further citations to the Code of Federal Regulations are to the 2015 edition.

subject merchandise to account for the estimated value of RINs.[4]  <u>See</u> Final Decision

Memo at 11–14.  Commerce viewed the estimated value of RINs as costs embedded

in respondents' U.S. sales prices, and increased normal value to "neutralize" those

embedded costs.  <u>See</u> <u>id.</u> at 11–12.    Further, when constructing normal value,

Commerce determined that a PMS distorted the costs of soybeans, a primary input

in biodiesel.  <u>Id.</u> at 21–23; <u>see also</u> Prelim. Decision Memo at 19.  Specifically,

Commerce found that distortions caused by the GOA's export tax regime rendered

the prices respondents paid for soybeans outside the ordinary course of trade.  <u>See</u>

Final Decision Memo at 21.  Commerce thus adjusted respondents' cost of production

by substituting a market-determined price for respondents' reported soybean prices.

<u>Id.</u>

     On May 15, 2018, Plaintiffs Vicentin S.A.I.C., Oleaginosa Morenos Hermanos

S.A., and Molinos Agro S.A. (collectively "Vicentin") commenced the present action,

---

[4] RINs are tradeable credits established pursuant to a U.S. regulatory scheme administered by the Environmental Protection Agency ("EPA").  <u>See</u> <u>Vicentin I</u>, 43 CIT at __, 404 F. Supp. 3d at 1328 (citing Prelim. Decision Memo at 28–30). The EPA requires that biodiesel producers or importers ("obligated parties") meet an annual "renewable volume obligation," pursuant to which obligated parties must submit RINs equal to the number of gallons of renewable fuel comprising their renewable volume obligation.  <u>Id.</u> (citing Prelim. Decision Memo at 28–29).  RINs are generated through biodiesel production in the United States or importation of biodiesel.  <u>Id.</u> (citing Prelim. Decision Memo at 29). The obligated party that generates RINs may use them to satisfy its renewable volume obligation, or it may trade or sell them to other obligated parties.  <u>Id.</u>  (citing Prelim. Decision Memo at 29).

which was later consolidated with an action brought by LDC Argentina.[5] <u>See</u>

Summons, May 15, 2018, ECF No. 1; Compl., May 16, 2018, ECF No. 7; Memorandum

and Order, July 20, 2018, ECF No. 18.  Vicentin and LDC Argentina challenged

Commerce's decision to account for the RINs by increasing constructed value.  <u>See</u>

Pls.' Br. Supp. Mot. J. Agency R. Confidential Version at 1–2, 7–20, Oct. 29, 2018,

ECF No. 26 ("Pls.' Moving Br."); Memo. of Points & Authorities Supp. Consol. Pl.'s

Rule 56.2 Mot. J. Agency R. at 8, 10–21, Oct. 29, 2018, ECF No. 25-1 ("Consol. Pl.'s

Moving Br.").  Vicentin and LDC Argentina also challenged Commerce's methodology

for determining constructed value in light of the agency's PMS finding regarding

soybeans.  <u>See</u> Pls.' Moving Br. at 20–38; Consol. Pl.'s Moving Br. at 10–21.  Vicentin

argued, inter alia, that Commerce's determination to disregard Vicentin's reported

costs of soybeans in Argentina was unsupported by the record.  Pls.' Moving Br. at

28–38.

In <u>Vicentin I</u>, the court remanded Commerce's final determination for further

consideration or explanation.  <u>See</u> <u>Vicentin I</u>, 43 CIT at __, 404 F. Supp. 3d at 1343.

The court ruled that Commerce failed to identify its statutory authority for increasing

constructed value to neutralize the value of RINs embedded in respondents' U.S. sales

prices.  <u>See</u> <u>Vicentin I</u>, 43 CIT at __, 404 F. Supp. 3d at 1329–34.  The court also ruled

---

[5] On June 13, 2018, the court issued an order allowing National Biodiesel Board Fair
Trade Coalition—the petitioner in the administrative proceeding below—to intervene
as a defendant-intervenor.  <u>See</u> Order, June 13, 2018, ECF No. 15.

that Commerce failed to adequately explain its determination that GOA's export tax regime caused a distortion giving rise to a PMS in light of the fact that the agency countervailed the GOA's program in the companion CVD proceeding. See id., 43 CIT at __, 404 F. Supp. 3d at 1340–43.

On January 31, 2020, Commerce published its remand redetermination. See generally Remand Results. On remand, Commerce reconsidered its decision to neutralize the value of RINs in respondents' U.S. sales by increasing constructed value, and instead decided to remove the value of RINs by decreasing the net U.S. Price. See Remand Results at 8–16. Commerce explained 19 U.S.C. § 1677a(a) and (b) direct the agency to determine the price at which merchandise is first sold, and that it is thus authorized to deduct the value of RINs from the invoice price for U.S. sales of biodiesel from Argentina in order to "isolate a U.S. starting price for biodiesel[.]" See id. at 9–11, 39. Additionally, Commerce restated its position that, despite having countervailed the GOA's export tax regime in the concurrent proceeding, disregarding reported costs of soybeans in Argentina in light of a PMS, without accounting for the possibility of a double remedy, is reasonable because the ADD and CVD statutes serve different purposes. See Remand Results at 22–31.[6]

_____

[6] On May 22, 2020, Defendant filed a letter notifying the court of the results of Commerce's changed circumstances review of the antidumping and CVD orders on biodiesel from Argentina. See Def.'s Notice Subsequent Development at 1–2, May 22,

(footnote continued)

Vicentin and LDC Argentina challenge Commerce's asserted authority to adjust for the value of RINs when determining U.S. Price as well as its support for its calculations. See Pls.' Cmts. on [Remand Results] Confidential Version    at  3–14, Mar. 2, 2020, ECF No. 82 ("Pls.' Br."); [Consol. Pl.'s] Cmts. on [Remand Results] at 2–7, Mar. 2, 2020, ECF No. 81 ("Consol. Pl.'s Br."). Further, Vicentin and LDC Argentina challenge Commerce's adjustments for the value of RINs as unsupported by substantial evidence. See Pls.' Br at 14–19; Consol. Pl.'s Br. at 7–10. Vicentin and LDC Argentina also challenge Commerce's continued determination to disregard reported costs of soybeans in Argentina to remedy a PMS. See Pls.' Br. at 20–26; Consol. Pl.'s Br. at 13–16.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516a(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012)[7] and 28 U.S.C. § 1581(c)

---

2020, ECF No. 94 ("Def.'s Notice") (citing Biodiesel from Argentina, 85 Fed. Reg. 27,987 (Dep't Commerce May 12, 2020) (final results of [CVD] changed circumstances review) ("Biodiesel from Argentina CVD/CRR"); Biodiesel from Argentina, 85 Fed. Reg. 29,989 (Dep't Commerce May 12, 2020) (final results of [ADD] changed circumstances review) ("Biodiesel from Argentina ADD/CRR"). Commerce determined that there were insufficient changed circumstances to warrant revisions to either order. See id. at 2 (citing Biodiesel from Argentina CVD/CRR, 85 Fed. Reg. at 27, 989; Biodesel from Argentina ADD/CRR, 85 Fed. Reg. at 27,987).

[7] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition. Citations to 19 U.S.C. § 1677e, however, are to the unofficial U.S. Code Annotated 2018 edition, which reflects the amendments made to 19 U.S.C. § 1677e by the Trade Preferences Extension Act of 2015. See Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362 (2015).

(2012), which grant the court authority to review actions contesting the final determination in an ADD investigation. The court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . ." 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

### I.     Lawfulness of the RIN Adjustment

#### A.     Statutory Authority for RIN Adjustment

Vicentin and LDC argue that 19 U.S.C. § 1677a(a) and (b) do not authorize Commerce to decrease U.S. Price to remove the value of RINs reflected in respondents' invoice prices to U.S. customers. See Pls.' Br. at 3–11;[8] Consol. Pl.'s Br.

---

[8] As a threshold matter, Vicentin argues that Vicentin I did not grant Commerce discretion to change its rationale, but rather, only to further explain its rationale. See Pls.' Br. at 2–3. Vicentin misapprehends the court's ruling. Vicentin I ruled that Commerce did not clearly identify the statutory and regulatory basis for its determination to increase normal value to account for the value of RINs. See Vicentin I, 43 CIT at __, 404 F. Supp. 3d at 1332–34. Vicentin I expressly "decline[d] to comment on precisely what steps Commerce should take on remand." Vicentin I, 43 CIT at __ n.14, 404 F. Supp. 3d at 1333 n.14; see also SEC v. Chenery Corp., 332 U.S. 194, 199–201 (1947).

at 2–7.  Defendant submits that 19 U.S.C. § 1677a(a) and (b) plainly support

Commerce's authority, and, in the alternative, insists on deference to the agency's

interpretation of the statute.  See Def.'s Resp. Cmts. on [Remand Results] at 11–24,

Apr. 15, 2020, ECF No. 89 ("Def.'s Br.").  Defendant and Defendant-Intervenor

National Biodiesel Board Fair Trade Coalition ("NBB Fair Trade Coalition" or "Def-

Intervenor") maintain that Commerce's approach is a reasonable method to isolate

the starting price of the subject merchandise.  Id.; [Def-Intervenor's] Cmts. on

[Remand Results] at 5–11, Apr. 15, 2020, ECF No. 90 ("Def.-Intervenor's Br.").  For

the following reasons, Commerce's adjustment to U.S. Price is in accordance with law.

Where Commerce determines that merchandise is being sold at less than fair

value ("LTFV") and the International Trade Commission ("ITC") determines that a

domestic industry is materially injured or threatened with material injury,

Commerce imposes an ADD.  See 19 U.S.C. § 1673.  To determine whether subject

merchandise is being sold at LTFV, Commerce makes "a fair comparison . . . between

the export price or constructed export price and normal value."[9]  19 U.S.C. § 1677b(a).

Export price ("EP") refers to:

---

[9] Further, the Statement of Administrative Action accompanying the Uruguay Round
Agreements Act ("SAA") acknowledges that to achieve the "fair comparison" of U.S.
Price to normal value required by 19 U.S.C. § 1677b(a), § 1677b "provides for the
selection and adjustment of normal value to avoid or adjust for differences between
sales which affect price comparability."  SAA, H.R. Doc. 103-316, at 820 (1994),

                                                                (footnote continued)

the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under [19 U.S.C. § 1677a(c)].

19 U.S.C. § 1677a(a).[10]  Constructed export price ("CEP") refers to:

the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or

---

reprinted in 1994 U.S.C.C.A.N. 4040, 4161.  The statute generally "seek[s] to produce a fair 'apples to apples' comparison between foreign market value and [U.S.] price," which requires "adjustments to the base value of both foreign market value and [U.S.] price to permit comparison of the two prices at a similar point in the chain of commerce." Torrington Co. v. United States, 68 F.3d 1347, 1352 (Fed. Cir. 1995).

[10]  19 U.S.C. § 1677a(c). Adjustments for export price and constructed export price

The price used to establish export price and constructed export price shall be--

(1) increased by--

(A) when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the subject merchandise in condition packed ready for shipment to the United States,

(B) the amount of any import duties imposed by the country of exportation which have been rebated, or which have not been collected, by reason of the exportation of the subject merchandise to the United States, and

(C) the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle to offset an export subsidy, and

(2) reduced by--

(A) except as provided in paragraph (1)(C), the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and United States import duties, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States, and

(B) the amount, if included in such price, of any export tax, duty, or other charge imposed by the exporting country on the exportation of the subject merchandise to the United States, other than an export tax, duty, or other charge described in section 1677(6)(C) of this title.

> for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under [19 U.S.C. § 1677(c), (d)].

19 U.S.C. § 1677a(b).[11] Normal value refers to:

> the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price . . .

19 U.S.C. § 1677b(a)(1)(B)(i).[12]

---

[11] 19 U.S.C. § 1677a(d). Additional adjustments to constructed export price

For purposes of this section, the price used to establish constructed export price shall also be reduced by—

(1) the amount of any of the following expenses generally incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise (or subject merchandise to which value has been added)--

(A) commissions for selling the subject merchandise in the United States;

(B) expenses that result from, and bear a direct relationship to, the sale, such as credit expenses, guarantees and warranties;

(C) any selling expenses that the seller pays on behalf of the purchaser; and

(D) any selling expenses not deducted under subparagraph (A), (B), or (C);

(2) the cost of any further manufacture or assembly (including additional material and labor), except in circumstances described in subsection (e); and

(3) the profit allocated to the expenses described in paragraphs (1) and (2).

19 U.S.C. § 1677.

[12] Where Commerce determines that home-market sales prices or third-country sales

(footnote continued)

The antidumping statute does not dictate a method for determining "the price at which the subject merchandise is first sold," <u>see</u> 19 U.S.C. § 1677a(a)–(b), and the court affords Commerce significant deference in determinations "involv[ing] complex economic and accounting decisions of a technical nature." <u>Fujitsu Gen. Ltd. v. United States</u>, 88 F.3d 1034, 1039 (Fed. Cir. 1996) ("<u>Fujitsu</u>"). "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." <u>Ceramica Regiomontana, S.A. v. United States</u>, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986) (citing <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 843 (1984) ("<u>Chevron</u>"); <u>Abbott v. Donovan</u>, 6 CIT 92, 570 F. Supp. 41, 46–47 (1983)), <u>aff'd</u>, 810 F.2d 1137, 1139 (Fed. Cir. 1987) ("<u>Ceramica</u>"); <u>see also</u> <u>PSC VSMPO-Avisma</u>

---

prices should not be used to determine normal value, Commerce uses constructed value as a basis for normal value. <u>See</u> 19 U.S.C. § 1677b(a)(4); <u>see also</u> Prelim. Decision Memo at 21–23. Constructed value consists of (1) the cost of materials and fabrication or other processing of any kind used to produce the merchandise; (2) the actual amounts incurred and realized by the exporter or producer being examined for selling, general, and administrative expenses, and profits, tied to the production and sale of the goods; and (3) the cost of packing the merchandise for shipment to the United States. <u>See</u> 19 U.S.C. § 1677b(e). If Commerce determines that "a [PMS] exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade," Commerce "may use another calculation methodology under this part or any other calculation methodology." 19 U.S.C. § 1677b(e).

Corp. v. United States, 688 F.3d 751, 764 (Fed. Cir. 2012) (quoting Fujitsu, 88 F.3d

at 1039).

Commerce invokes 19 U.S.C. § 1677a(a) and (b) as its authority for applying

19 C.F.R. § 351.401(c) to isolate the starting price of biodiesel.  See Remand Results

9–10.  Pursuant to 19 C.F.R. § 351.401(c), when calculating U.S. Price, Commerce

relies on a "price that is net of price adjustments, as defined in section 351.102(b),

that are reasonably attributable to the subject merchandise or the foreign like

product (whichever is applicable)."   Remand Results at 10 (quoting 19 C.F.R.

§ 351.401(c)).  Commerce defines price adjustments as:

> a change in the price charged for subject merchandise or the foreign like
> product, such as a discount, rebate, or other adjustment, including,
> under certain circumstances, a change that is made after the time of sale
> (see section 351.401(c)), that is reflected in the purchaser's net outlay.

19 C.F.R. § 351.102(b)(38).[13]

---

[13] The regulatory history of 19 C.F.R. § 351.102(b) indicates that the list of examples
is not exhaustive:

> With respect to the proposed changes to 19 C.F.R. 351.102(b)(38) in the
> Proposed Rule, these modifications were not intended to foreclose other
> types of price adjustments, such as billing adjustments and post-sale
> decreases to home market prices or increases to U.S. prices.
> Nonetheless, in light of a party's comment, the Department is modifying
> 19 CFR 351.102(b)(38) to refine the definition of price adjustment and
> to clarify that a price adjustment is not just limited to discounts or
> rebates, but encompasses other adjustments as well.

Modification of Regulations Regarding Price Adjustments in Antidumping Duty

(footnote continued)

Here, Commerce asserts that it adjusts the price on invoices to U.S. customers to arrive at the "price at which the subject merchandise is . . . 'first sold (or agreed to be sold) in the United States.'"  <u>Remand Results</u> at 10, 38; <u>see also</u> 19 U.S.C. § 1677a(a), (b).  Commerce argues that RINs are essentially a commodity, and that the invoice price for the subject merchandise reflects the value of this commodity.  <u>See</u> <u>Remand Results</u> at 11 ("Essentially, when a foreign producer/exporter sells RIN-eligible biodiesel to the United States, it is selling two commodities: biodiesel, bundled with a RIN.").  Commerce thus characterizes the value of RINs "as an adjustment already included in the reported invoice price for biodiesel[.]"  <u>Id.</u> at 10.  Commerce regulations provide that it shall rely on a "price that is net of price adjustments, as defined in section 351.102(b)[.]"  19 C.F.R. § 351.401.  Commerce isolates the starting price of biodiesel by removing the adjustment to the invoice price that it finds attributable to the value of RINs.  <u>See</u> 19 C.F.R. § 351.401(c); <u>see also</u> 19 C.F.R. § 351.102(b)(38).

Commerce has stated its authority to isolate the price of biodiesel by removing the value associated with RINs.  Section 1677a(a) requires Commerce to identify the

---

<u>Proceedings</u>, 81 Fed. Reg. 15,641, 15,644 (Int'l Trade Admin. Mar. 24, 2016) (final rule); <u>see also</u> <u>Antidumping Duties; Countervailing Duties</u>, 61 Fed. Reg. 7,308, 7,329 (Int'l Trade Admin. Feb. 27, 1996) (notice of proposed rulemaking); <u>Antidumping Duties; Countervailing Duties</u>, 62 Fed. Reg. 27,296, 27,300 (Int'l Trade Admin. May 19, 1997) (final rule).

price at which the merchandise is first sold.[14]  See 19 U.S.C. § 1677a(a); 19 C.F.R.

§ 351.401(c).  It is reasonably discernible that Commerce interprets section 1677a(a)

and (b)'s directive to determine "the price at which the subject merchandise is first

sold (or agreed to be sold)" as requiring the agency to determine a starting price for

the subject merchandise,  see Remand Results at 10,  such that it is not beholden to

"the invoice price" where that price "does not reflect the true 'starting price' of

biodiesel or 'price at which the subject merchandise is first sold.'"  See id.  Pursuant

to 19 C.F.R. § 351.401(c), Commerce's methodology is reasonable because it identifies

"the price at which the subject merchandise is first sold (or agreed to be sold)" by

separating out value that is attributable to a distinct commodity.  See 19 U.S.C.

§ 1677a; see also Chevron, 467 U.S. at 843–44.

Vicentin argues that Commerce's approach under 19 C.F.R. § 351.401(c)

contradicts the plain meaning of 19 U.S.C. § 1677a.  See Pls.' Br. at 3–13.  Vicentin

submits that the only adjustments to U.S. Price allowed under subsections (a) and (b)

---

[14] The parties' arguments that 19 U.S.C. § 1677a(a)–(b) plainly support their respective positions lack merit.  See Def.'s Br. at 12–21; Pls.' Br. at 11–13; Consol. Pl.'s Br. at 6–7. The statute does not provide a methodology for determining the "price at which the subject merchandise is first sold (or agreed to be sold) in the United States[.]"  See 19 U.S.C. § 1677a(a)–(b).  In the absence of a prescribed statutory methodology for determining the starting price, "[a]s long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." Ceramica, 10 CIT at 404–05, 636 F. Supp. at 966 (citing Chevron, 467 U.S. at 843).

are those enumerated under 19 U.S.C. § 1677a(c)–(d), and that none of the

enumerated adjustments allow Commerce to decrease U.S. Price to account for the

value of RINs.  See id. (citing Dongguan Sunrise Furniture v. United States, 36 CIT

860, 893–95, 865 F. Supp. 2d 1216, 1248–49 (2012) ("Dongguan")).  Vicentin relies

specifically on the language "as adjusted by [subsection (c) or subsections (c) and (d)]"

contained in subsections (a) and (b), respectively, to argue that Commerce's choices

are    limited   by   statute.    Pls.'   Br.   at   10   (quoting   19   U.S.C.

§ 1677a(a), (b)).  However, as explained, it is reasonably discernible that Commerce

interprets 19 U.S.C. § 1677a(a)–(b) as requiring the agency to determine a "starting

price" for the subject merchandise that must also, and separately, be "adjusted" under

subsections (c) and (d).  See Remand Results at 39–40; see also 19 U.S.C. § 1677a(c)–

(d).[15]   As such, Vicentin's arguments regarding 19 U.S.C. § 1677a(c)–(d) are

unavailing.  See Pls.' Br. at 4–9.  Commerce observes that, instead of prices for the

---

[15] Vicentin's reliance on Dongguan is unavailing.  See Pls.' Br. at 7–8 (citing
Dongguan, 36 CIT at 893–95, 865 F. Supp. 2d at 1248–49).  Dongguan upheld
Commerce's practice of deducting net freight expenses from U.S. Price under 19
U.S.C. § 1677a(c)(2)(A) because the statute does not specify whether the deduction
should be calculated based on "net" or "gross" freight expenses.  See Dongguan, 36
CIT at 893–95, 865 F. Supp. 2d at 1248–49.  Dongguan then dismissed the
counterargument that freight revenues should be included in U.S. Price under 19
U.S.C. § 1677a(a) or (b) because, in addition to the lack of evidence that the freight
revenue in that proceeding was "inherently part of the [U.S. Price,]" the argument
"overlook[ed] the statutory requirement to adjust [EP] or [CEP] to permit an 'apples-
to-apples' comparison[.]"  Id. at 1249–50.  To that end, Dongguan viewed 19 U.S.C.
§ 1677a(c)–(d) as setting forth necessary adjustments to the U.S. Price, but nowhere
purports to limit Commerce's discretion to determine the starting price under 19
U.S.C. § 1677a(a)–(b).

sale of biodiesel, the reported invoice prices reflect transactions for the sale of

biodiesel plus an added amount for the value of RINs—the latter component being a

separate commodity with measurable and discernible value.  See Remand Results at

8–14, 36.  In this case, it is not unreasonable for Commerce to treat the value of RIN

as an adjustment pursuant to 19 C.F.R. §§ 351.401(c) and 351.102(b)(38).

Commerce's invocation of 19 U.S.C. § 1677a(a) and (b) as the basis for its statutory

authority for applying 19 C.F.R. § 351.401(c) is in accordance with law.[16]

### B.    Commerce's Antidumping Margin Calculations

Vicentin argues that Commerce's antidumping margin calculation is contrary

to law because it contravenes 19 U.S.C. §§ 1677f(2)(i) and 1677b(e) as well as agency

practice.  See Pls.' Br. at 17–19.  Defendant answers that Commerce clearly identifies

and explains its calculations, which are consistent with the statute.  See Def.'s Br. at

27–29.   For the reasons that follow, Commerce's methodology for its margin

calculation on remand is reasonable.

---

[16] LDC Argentina proposes that Commerce instead account for the value of RINs by
adding expenses associated with making biodiesel RIN-compliant to constructed
value.  See Consol. Pl.'s Br. at 10–14.   However, Commerce observes that those
expenses only represent a small fraction of the value of RINs, and further, explains
that there is enough information on the record to enable the agency to more fully
ascertain the value of RINs.  See Remand Results at 41–42.  As explained below,
Commerce's methodology for ascertaining the value of RINs is reasonable, therefore,
the court declines LDC Argentina's proposed solution.

Commerce has considerable discretion to develop methodologies when administering the antidumping laws. See NTN Bearing Corp. of Am. v. United States, 26 C.I.T. 53, 81–82, 186 F. Supp. 2d 1257, 1285 (2002) (citing Federal-Mogul Corp. v. United States, 18 C.I.T. 785, 807–08, 862 F. Supp. 384, 405 (1994) (internal citations omitted); Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 936 (Fed. Cir. 1984)). However, when Commerce chooses to deviate from an established practice or methodology, the agency must clearly explain itself so that the court may assess the reasonableness of its decision. See Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade, 412 U.S. 800, 808 (1973) (the agency has a "duty to explain its departure from prior norms."). Additionally, Commerce's regulations provide, in pertinent part, that it:

> will disclose to a party to the proceeding calculations performed, if any, in connection with . . . a final determination under [19 U.S.C. § 1673d] . . . normally within five days after the date of any public announcement or, if there is no public announcement of, within five days after the date of publication of[ ] the . . . final determination[.]

19 C.F.R. § 351.224(b).

Commerce has, consistent with 19 U.S.C. § 1677f(i)(2), given notice and explanation of the methodology used in its final determination. See generally Final Results; Final Decision Memo. On remand, Commerce explains that it is taking the same RIN values used in the final determination and deducting them from the U.S. Price rather than adding them to normal value. See Remand Results at 14. Commerce placed on the remand record its revised calculations in the form of excel

spreadsheets, viewing this to be the most transparent way to illustrate its revisions.

See Remand Results at 14–15 (citing, inter alia, Vicentin Draft Remand Analysis

Memo & Attach. 1, CRRs 3, 1, bar codes 3926704-01, 3926694-01 (Jan. 6, 2020)

("Vicentin Analysis Memo" and "Remand Calculations", respectively); see also id. at

42. Commerce also provided to the parties the Vicentin Analysis Memo, see Vicentin

Analysis Memo, where it explains how it removed the RIN values from the previously-

determined constructed value, decreased U.S. Price by the amount of those RIN

values, and calculated the margin.[17]

Commerce's methodology is consistent with the statute and sufficiently

explained. Vicentin's appears to argue not that Commerce fails to explain what it

did, but rather, that Commerce did not do, and then explain, what it should have

done. See Pls.' Br. at 19 ("Commerce claims that it is adopting an adjustment to

Vicentin's U.S. 'starting prices' . . . but Commerce does nothing of the kind.").

Vicentin contends that instead of adjusting individual starting prices, Commerce is

---

[17] Specifically, in the Vicentin Analysis Memo, Commerce explains that it deducted
the RIN values from the U.S. Price by converting the SAS dataset it generated for the
final determination into an excel spreadsheet; dividing the sum of the extended
margin (the variable "EMARGIN") by the sum of the variable USVALUE; subtracting
the RIN value (the variable "RINADJ")   from normal value; subtracting the same
RINADJ variable from the mean net U.S. price (represented by the variable
"USNETPRI_Mean") to determine a revised U.S. Price net of the RIN adjustment;
subtracting the revised U.S. Price from the revised normal value; multiplying the
difference by QTYU1 to derive a new extended margin, and then dividing the new
extended margin $^{(\![\![}$                       $^{]\!]\!)}$ by the sum of the USVALUE $^{(\![\![}$                       $^{]\!]\!)}$.
See Vicentin Analysis Memo at 1–2 (citing Remand Calculations).

actually using an average net price for each control number and applying the RIN value adjustment to that price.  See Pls.' Br. at 19.   Vicentin's argument incorrectly assumes that Commerce lacks the expertise and discretion to decide a particular methodology for adjusting the starting prices to account for the value of the RINs. See id.; but see Ceramica, 10 CIT at 404–05, 636 F. Supp. at 966 (citing Chevron, 467 U.S. at 843).  Commerce explains it now accounts for the value of RINs on the U.S. Price side of the LTFV equation by decreasing U.S. Price. Previously, Commerce had increased normal value (here, constructed value) to match the value of the RINs in U.S. selling prices.  Therefore, here, it decreases normal value to reverse the effect of its prior methodology, and decreases U.S. Price to implement its methodology on remand.  See Remand Results at 14–16.  Moreover, Commerce provided to the parties an explanation of its revisions for comment in the underlying proceeding, and Vicentin did not request additional calculation disclosure materials.  See id. at 14–16, 42; see also Vicentin Analysis Memo.  Vicentin fails to elaborate how Commerce's explanation fails to satisfy 19 U.S.C. § 1677f(i)(2).

Further, Vicentin's argument that, pursuant to 19 U.S.C. § 1677b(a)(4) and 1677b(e), Commerce is required to add the components of constructed value fails.  See Pls.' Br at 19.   The statute provides that "the constructed value of imported merchandise shall be an amount equal to the sum of [various costs and amounts]." See 19 U.S.C. § 1677b(e).  The statute requires constructed value to be equal to the

"sum" of the listed amounts but does not state that Commerce must provide separate

component sums or figures in its remand calculations.

Finally, Vicentin argues that Commerce's approach is contrary to agency

practice because, rather than perform a new margin calculation that adjusts the U.S.

invoice price to account for RINs, "Commerce simply provides a worksheet containing

limited data output from its improperly determined margin." Pls.' Br. at 18.   Again,

Vicentin appears to take issue with Commerce's application of the RIN adjustment

to the average U.S. net price for each control number, suggesting, without

illustration, that applying the adjustment to the averaged data creates inaccuracies

in Commerce's margin calculations. See Pls.' Br. at 18–19.  However, Vicentin fails

to demonstrate that Commerce's methodology on remand is unreasonable.   It is

reasonable for Commerce to make the adjustment without performing a new margin

calculation because the agency seeks to reallocate a value—a task which, on its own,

does not compromise the integrity of Commerce's calculations such that a new

calculation is apparently warranted.  Even if Commerce here deviates from its typical

methodology, the agency explains that it views this approach to be the most

transparent method for making its adjustments.  Remand Results at 42.  Further, as

Commerce observes, Vicentin did not request additional calculation disclosure

materials, or for any specific changes to be made.  See id.  A bald statement that

Commerce's approach constitutes a deviation from agency practice resulting in

incorrect margins fails to demonstrate how Commerce's determination is
unreasonable.

### C.    Reasonableness of Commerce's RINs Adjustment

Vicentin submits that Commerce's determination that its sales reflect the
value of RINs is unsupported by substantial evidence. See Pls.' Br. at 14–17. LDC
Argentina argues that the calculated RIN values are not supported by substantial
evidence because Commerce does not connect the separate RINs to the individual
transaction values in the sales databases. See Consol. Pl.'s Br. at 7–10.[18] Defendant
and Defendant-Intervenor maintain that Commerce adequately explained and
supported its finding that prices for biodiesel imported into the United States from
Argentina are upwardly adjusted to account for the value of RINs. See Def.'s Br. at
24–27; Def.-Intervenor's Br. at 11–17. For the reasons that follow, Commerce
reasonably calculates the RIN adjustment.

---

[18] LDC Argentina initially claims that Commerce's reliance on "hypothetical" values
when adjusting U.S. Price is not permitted by statute, but later clarifies that by
describing RINs as a "hypothetical" or "proxy" value, it is contending that the values
are not "directly connected to the biodiesel sales in the period of investigation."
Consol. Pl.'s Br. at 3–8. As discussed below, Commerce reasonably explains that the
RIN values are not hypothetical. See Remand Results at 36. Further, to the extent
that LDC Argentina contends that 19 U.S.C. § 1677a(a)–(b) requires Commerce to
start with the price as reported on an invoice, as Commerce notes, there is record
evidence that the invoice price does not capture the value of the subject merchandise
alone, see Remand Results 8–14, 36, and such an interpretation, which is not plainly
supported by the statute, would unduly restrict the agency's application of the statute
to the frustration of its purpose. See 19 U.S.C. § 1677a(a)–(b).

As explained, 19 U.S.C. § 1677a(b) requires Commerce to calculate EP or CEP by starting with "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States" and making certain adjustments to that price pursuant to 19. U.S.C. § 1677(c), (d).  Pursuant to 19 C.F.R. § 351.401(c), Commerce relies on a "price that is net of price adjustments, as defined in section 351.102(b), that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable)."

Commerce's determination that the price of biodiesel in sales to U.S. customers are upwardly adjusted to account for the value of RINs is supported by the record.[19] On remand, Commerce cites the Congressional Research Service as support for its finding that RINs are tradeable credits and, as such, are effectively commodities with independent value.  See Remand Results at 11 (citing Petitioner's [PMS] Allegation Regarding Respondents' Home and Third Country Market Sales and Cost of Production at Ex. 13, PD 189–98, bar codes 3604083-01–10 (Aug. 2, 2017) ("PMS Allegation")).  Additionally, Commerce cites data from the ITC to demonstrate that, when RINs are attached to the sale of biodiesel, the price of that sale is significantly

---

[19] In its preliminary results, Commerce found that "all biodiesel shipped from Argentina is eligible for a D4 RIN, the RIN type applicable to fuel made from soybean feedstock."  Prelim. Decision Memo at 30 (citing PMS Allegation at 30); see also Def.-Intervenor's Br. at 15 (citations omitted).

higher.  See Remand Results at 11–12 (citing PMS Allegation at Ex. 9 Table V-4).[20]

Finally, noting LDC Argentina and Vicentin's claims that RIN values were not a

separately negotiated component of their reported prices, Commerce points to

findings contained in the preliminary ITC Report that the price of biodiesel is

typically comprised of the value of the merchandise itself, the value of any attached

RINs, and occasionally a portion of the blender's tax credit.  See Remand Results at

12 (citing PMS Allegation at Ex. 9).  According to Commerce, a U.S. consumer of

Argentine biodiesel indicated that the RIN value "is just embedded in the price of the

product that [they] pay for. . . [and views] the RIN as just value components to the

product that [they are] buying."  Remand Results at 13 (quoting Petitioner's Rebuttal

Factual Information pts. 5–6 at p.109 of the ITC Staff Conference Transcript, PD

273–274, bar codes 3620192-05–06 (Sept. 15, 2017)).

Commerce supports its finding that RIN values are built into the price of

Argentine biodiesel using record evidence about Vicentin's and LDC's own practices.

Although Vicentin cites a statement from an unaffiliated U.S. customer that "it is

absolutely impossible to link the revenue it receives from sales of separated RINs to

its import purchase transactions for biodiesel from Plaintiffs[,]" Pls.' Br. at 15 (citing

Vicentin's Section B and C Suppl. Questionnaire Response at Ex. 6a, CD 440, bar

---

[20] For example, the data indicates an average price of $2.27 per gallon for B99
biodiesel with RINs attached, as opposed to $1.01 per gallon for biodiesel without
RINs in 2016.  Remand Results at 11–12 (citing PMS Allegation at Ex. 9 Table V-4).

code 3613816-03 (Aug. 30, 2017)), Commerce points to LDC's and Vicentin's own

indications that awareness of the value of RIN-eligible biodiesel to U.S. customers is

ubiquitous.  See Remand Results at 12–13, 40–41.[21]  As Commerce observes, Vicentin

admitted, during verification, that even though  "RIN eligibility is not expressly

discussed while negotiating biodiesel sales contracts, the company is informally

aware that all U.S. sales must be accompanied by the certifications necessary to

establish that the biodiesel is 'RIN eligible'" and that "Vicentin knows to only sell

RIN-eligible biodiesel to U.S. {customers} because non-RIN-eligible biodiesel has

minimal value in the U.S. market."   Remand Results at 13, 40–41 (quoting

Verification of Vicentin's Sales Questionnaire Responses at 26, PD 414, bar code

3646347-01 (Nov. 29, 2017) ("Vicentin Sales Verification")).  Moreover, Commerce

points to Vicentin's acknowledgement that the description "RIN-eligible is often

included in the offer/confirmation emails between Vicentin and its U.S. customers[.]"

Remand Results at 13 (quoting Vicentin Sales Verification at 26).  Commerce points

to LDC's U.S. affiliate's indication that even though RIN values are not explicitly

---

[21] Vicentin distinguishes itself from LDC, arguing that it neither generates nor has
information regarding the value of, RINs.  See Pls.' Br. at 16.  Commerce does not
seek to demonstrate that Vicentin generates or sells RINs, as Vicentin suggests, see
id. at 14–16; rather, Commerce demonstrates that the Vicentin's U.S. Price is
upwardly adjusted to reflect the value of RIN-eligible biodiesel.  See Remand Results
at 12 (noting that Vicentin's and LDC's claims that RINs are not a separate
component in the invoice "do not contradict the conclusion that sales prices charged
to U.S. customers contain both a biodiesel component and a RIN component."); see
also id. at 40.

included as a line item in the overall pricing, the value is implicitly factored in, and

that "obligated buyers are cognizant of the value of RINs associated with a sale and

likely factor it in when negotiating a price because they need RINs to meet their EPA

obligations[.]" Remand Results at 12–13 (citing Verification of LDC's CEP Sales at

8, PD 413, bar code 3646257-01 (Nov. 30, 2017) ("LDC CEP Verification")[22]).

Commerce's determination that Vicentin's and LDC's U.S. prices are upwardly

adjusted to account for RINs is thus supported by substantial evidence.

In order to derive the value of RINs, Commerce relies on spot prices contained

in daily biodiesel reports, published by a broker and provided to Commerce by LDC's

U.S. affiliate, for all CEP sales, alongside RIN values reported by petitioners for all

EP sales—noting that these values are nearly identical. See Prelim. Decision Memo

at 30; see also id. at 38 (citations omitted).   Commerce does so, based on facts

available, because, except for the RIN values associated with LDC Argentina's CEP

price sales, the respondents were unable to estimate RIN values. See Remand

Results at 6; Prelim. Decision Memo at 28–30; Vicentin I, 43 CIT at __ n.4, 404 F.

Supp. 3d at 1328 n.4; 19 U.S.C. § 1677e(a).   Commerce explains that these prices are

derived from the only market available for trading RINs, the EPA Moderated

---

[22] The U.S. affiliate added that ". . . RIN values are not discussed during sales
negotiations or identified in sales contracts."  LDC CEP Verification at 8.  However,
regardless of whether RIN values are discussed during sales negotiations or
identified in sales contracts, Commerce cites the initial statement in support of its
position that RIN values are an implicit factor in the price of Argentine biodiesel.  See
Remand Results at 12–13.

Transaction System.  See Remand Results at 38 (citing PMS Allegation at Ex. 13).

Commerce's reliance on spot prices is also reasonable.

LDC Argentina contends that Commerce's reliance on estimates and spot prices to calculate the RINs adjustment is not supported by substantial evidence because those prices are not "sufficiently connected to the sales at issue." See Consol. Pl.'s Br. at 7–10.  However, considering respondents' failure to report the value of RINs embedded in the prices for those sales, Commerce reasonably relies on its findings that U.S. sales of biodiesel contain a RIN component, and that the RIN values are easily discernible from published sources.  See Remand Results at 36–37. LDC Argentina submits that there is no evidence establishing that prices for separated RINs would be the same as prices for attached RINs.  Consol. Pl.'s Br. at 8–9.  However, Commerce notes that the price for RINs are the product of market mechanisms, and that there is no evidence demonstrating that the price of separated RINs would be different than the price for attached RINs.  See Remand Results at 37.  Thus, it is not the case, as LDC Argentina suggests, that Commerce is "guessing" the value of RINs when rendering the adjustment to U.S. Price.  Consol. Pl.'s Br. at 10 ("Commerce is not permitted to guess").  Rather, as Defendant argues, Commerce draws reasonable inferences from the information available, explaining that spot prices demonstrate what buyers must pay for RINs at that given moment, and that "there is no basis to believe a seller [of RIN-eligible biodiesel] would accept anything less than that amount [when determining prices.]"  See Remand Results at 37; see

also Def.'s Br. at 25 ("The Plaintiffs are large, private, profit-driven companies. The idea that they would not take RINs into account when calculating export prices is nonsensical.").  Without more, LDC Argentina and Vicentin fail to demonstrate that Commerce's determination is unreasonable.  See Consolo. v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

### D.     The Imposition of a Double Remedy

Vicentin and LDC Argentina again contend that Commerce does not explain why the remedy imposed as a result of the CVD investigation does not remedy the PMS distortion.  See Pls.' Br. at 20–25; Consol. Pl.'s Br. at 13–16.  Defendant insists that the law does not require Commerce to ascertain whether the CVD remedy ameliorated the PMS distortion, but nonetheless counters that Commerce reasonably explains that the CVD did not remedy the distortion in this case.  See Def.'s Br. at 29–32.  For the reasons that follow, Commerce's determination is remanded for further explanation or reconsideration.

As discussed, dumping determinations require Commerce to compare U.S. Price and normal value.  See 19 U.S.C. § 1677b(a).  Normal value may be based upon home market sales made in the ordinary course of trade, third-country sales, or constructed value.  See 19 U.S.C. § 1677b(a)(1)(B)–(C), (a)(4).  Commerce determines normal value based upon constructed value, rather than home market sales, where a

PMS exists.[23]  <u>See</u> 19 U.S.C. § 1677b(a)(4); <u>see also</u> Prelim. Decision Memo at 21–23.

To establish the existence of a PMS, Commerce must demonstrate that there are

distortions present in the market and that those distortions prevent a proper

comparison of normal value with EP or CEP.  <u>See</u> 19 U.S.C. § 1677b(a)(1)(B)(ii)(III),

(C)(iii).  Commerce then calculates constructed value by determining "the cost of

materials and fabrication or other processing, plus an amount for selling, general,

and administrative expenses, as well as an amount for profit."  <u>See</u> 19 U.S.C.

§ 1677b(e).  The statute further provides that, when calculating constructed value,

the presence of a separate PMS may permit Commerce to deviate from the typical

methodology:

> For purposes of paragraph (1), if a [PMS] exists such that the cost of
> materials and fabrication or other processing of any kind does not
> accurately reflect the cost of production in the ordinary course of trade,
> the administering authority may use another calculation methodology
> under this part or any other calculation methodology.

19 U.S.C. § 1677b(e).[24]  Therefore, when using constructed value, Commerce may

resort to any other calculation methodology if a PMS renders the cost of materials

---

[23] Commerce resorted to constructed value after finding that "domestic biodiesel sales prices are established by the government and are not based on competitive market conditions[,]" resulting in a PMS.  Final Decision Memo at 16.

[24] Here, in addition to the initial PMS that caused Commerce to calculate the normal value of biodiesel based on constructed value, Commerce separately finds that an export tax regime in Argentina results in a PMS that distorts the costs of soybeans—an input in the production of biodiesel.  <u>See</u> <u>Vicentin I</u>, 43 CIT at __, 404 F. Supp. 3d

(footnote continued)

and fabrication unsuitable for use as normal value.  Commerce's determinations must

be supported by substantial evidence.  See Consol. Edison Co. v. NLRB, 305 U.S. 197,

229 (1938); see also Suramerica de Aleaciones Laminadas, C.A. v. United States, 44

F.3d 978, 985 (Fed. Cir. 1994).

     Although the statute empowers Commerce to use another methodology

provided under the statute, or any other methodology it chooses, to establish normal

value, the methodology it chooses must be reasonable.  The court reviews Commerce's

determinations for substantial evidence, meaning that they are reasonable given the

factual record in the case.  See e.g., Huaiyin Foreign Trade Corp. v. United States,

322 F.3d 1369, 1374 (2003) (citing Atl. Sugar, Ltd. v. United States, 744 F.2d 1556,

1562 (Fed. Cir. 1984)).  Commerce and Defendant correctly observe that the statute

does not mandate offsetting CVDs from a concurrent CVD case where Commerce uses

constructed value or an alternative under 19 U.S.C. § 1677b(e).  See Remand Results

28–30; Def.'s Br. at 32.  However, the lack of a statutory directive does not render

Commerce's alternative methodology reasonable.  See Motor Vehicle Mfrs. Ass'n of

U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983).

---

at 1334–43; Remand Results at 17–21.  To remedy the distortion caused by the export
tax regime, Commerce employs an alternate methodology, and relies on international
market prices for soybeans contained in petitioner's PMS allegation. See id. at 17–18
(citing Final Decision Memo at 21–23); see also Final Decision Memo at 21–23 (citing
Vicentin Prelim. Cost Memo., PD 356, bar code 3633485-01 (Oct. 19, 2017); LDC
Prelim. Cost Memo., PD 359, bar code 3633491-01 (Oct. 19, 2017) (citing PMS
Allegation at Ex 3).

Commerce has not explained how any distortion created by the PMS in this case has not already been remedied by the concurrent CVD case, and therefore its resort to international market prices for soybeans, without adjustment for the CVD remedy, is unreasonable.  In its remand, Commerce spends a good deal of time explaining the different purposes of the AD and CVD regimes.[25]  Commerce also explains how companies that benefit from subsidies may use those subsidies for purposes other than lowering the price of exports.[26]  Commerce labels "speculative" the view that subsidies affect normal value.[27] Remand Results at 26.  Commerce's comments fail to address the problem posed by the court, namely whether its

---

[25] Commerce disagrees with the notion that it must demonstrate why the CVD imposed on the GOA's export tax regime did not cure the distortion giving rise to its PMS finding.  See Remand Results at 22–31; see also Vicentin I, 43 CIT at __, 404 F. Supp. 3d at 1341–43 (citing Biodiesel From the Republic of Argentina, 82 Fed. Reg. 53,477 (Dep't Commerce Nov. 16, 2017) (final affirmative [CVD] determination) and accompanying Issues and Decision Memo. for the Final Determination in the [CVD] Investigation of Biodiesel from the Republic of Argentina at 13, C-357-821, (Nov. 6, 2017), available at https://enforcement.trade.gov/frn/summary/argentina/2017-24857-1.pdf (last visited June 23, 2020)).  Commerce explains, and Defendant echoes, that the CVD and AD regimes target different behaviors.  See Remand Results at 24–27; Def.'s Br. at 29–32.

[26] Both Commerce and the Defendant give a list of effects that the subsidy may have that do not necessarily affect the U.S. Price.  See Remand Results at 26–27 (noting that a subsidy may, for example, increase foreign production and shipment volumes to the U.S., or render a mismanaged producer solvent); Def.'s Br. at 30–31.

[27] Namely, according to Commerce, a CVD is not intended to address the differential between the U.S. Price and normal value, and a countervailable subsidy may have no effect on the U.S. Price.  Remand Results at 25–28.

calculation of normal value (i.e., using international market prices for soybeans) remedies subsidies that have already been remedied by the concurrent CVD case.

Commerce's use of an alternative methodology for constructed value, using market prices for soybeans, may remedy the effects of domestic subsidization already remedied by the concurrent CVD case, such that Commerce must either account for the increase in the weighted average dumping margin resulting from the countervailing duties or explain why doing so is unnecessary. Cf. 19 U.S.C. § 1677f-1(f)(1)(C) (offsetting the potential double remedy cause by using a surrogate value for normal value in an NME dumping case). Commerce's alternative calculation methodology corrects for a distortion in home market prices caused by a domestic subsidy that has potentially already been accounted for in the concurrent CVD case. Commerce itself alludes to the potential problem with its approach by the use of two examples. See Remand Results at 28–30.

The very examples Commerce gives in support of its position that no explanation or reconsideration is needed illustrate the relationships between the CVD and ADD cases, as well as why further explanation or reconsideration is needed in this case. First, Commerce invokes Congress's treatment of export subsidies, as opposed to domestic subsidies. Congress explicitly provides an adjustment to U.S. Price in an AD proceeding where Commerce has imposed a CVD to offset an export subsidy. See 19 U.S.C. § 1677a(c)(1)(C). The treatment of export subsidies illustrates that export subsidies affect only one side of the LTFV equation such that the price

differential between normal value and U.S. Price is presumed to be the result of the

subsidy.  See Low Enriched Uranium From France, 69 Fed. Reg. 46,501, 46,506 (Dep't

Commerce Aug. 3, 2004) (notice of final results of [ADD] admin. review).  Conversely,

domestic subsidies are presumed to impact both sides of the LTFV equation, such

that any price differential between normal value and U.S. Price is presumed to result

from something other than the subsidy.  See id.

     Commerce also invokes Congress's treatment of concurrent remedies in the

non-market economy ("NME") context.[28]  In the NME situation, a domestic subsidy

that would normally affect both sides of the LTFV is remedied when Commerce

determines normal value because the statute requires that normal value be

determined through surrogate values.  See 19 U.S.C. § 1677b(c) (providing that rather

than using invoice prices Commerce constructs a normal value using factors of

production).  Because the NME surrogate value provisions effectively remedy the

domestic subsidy in an ADD case (by increasing the normal value side of the LTFV

equation), Congress provided a statutory provision to avoid a double remedy where

---

[28] The term "nonmarket economy country" means any foreign country that Commerce determines "does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A). In such cases, Commerce must "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . [together with other costs and expenses.]"  19 U.S.C. § 1677b(c)(1).

there is a concurrent CVD case.  <u>Cf.</u> 19 U.S.C. § 1677f-1(f)(1)(C) (Commerce will
"reduce the antidumping duty [applied to NME imports] by the amount of the
increase in the weighted average dumping margin estimated by [Commerce] [to
result from the imposition of countervailing duties.]")[29]

 Here, Commerce's adoption of an international market price for soybeans when
calculating constructed value negates the assumed even-handedness of a domestic
subsidy and remedies the domestic subsidy in the same way that the surrogate values
remedy a domestic subsidy in an NME situation.  Congress has provided guidance for
addressing the risk of double counting in an NME situation, yet Commerce and
Defendant argue that its silence in this instance leave the Plaintiffs without a
remedy.  <u>See</u> <u>Remand Results</u> at 51; Def.'s Br. at 32.  However, Commerce's
methodology must still be reasonable.[30]  Commerce has not explained why the
dumping margin is not improperly increased when there is an unadjusted remedy
imposed for a PMS that has already been addressed by the imposition of CVDs on the
same merchandise, nor has it explained why it cannot adjust the remedy for the PMS

---

[29] Thus, "the new law instructs Commerce to reduce the duties applied to NME
imports when the antidumping and countervailing duties imposed on those goods
double count for the same unfair trade advantage." <u>Guangdong Wireking
Housewares & Hardware Co., Ltd. v. United States</u>, 745 F.3d 1194, 1197 (Fed. Cir.
2014).

[30] Commerce has acknowledged its desire to avoid double counting.  <u>See, e.g.</u>,
<u>Zhaoqing Tifo New Fibre Co. v. United States</u>, 41 CIT __, __ n. 8, 256 F. Supp. 3d
1314, 1319 n.8 (2017) (citations omitted).

Consol. Court No. 18-00111                                                                   Page 36
**PUBLIC VERSION**

to account for the already imposed CVDs.  Accordingly, Commerce's PMS determination is remanded for further explanation or reconsideration.

### CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Commerce's determination is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file their replies to comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint Appendix; and it is further

**ORDERED** that Commerce shall file the administrative record within 14 days of the date of filing of its remand redetermination.

 /s/ Claire R. Kelly
Claire R. Kelly, Judge


Dated:        July 1, 2020
              New York, New York