Slip Op. 21-33

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **VICENTIN S.A.I.C. ET AL.,** | |
| **Plaintiffs and Consolidated Plaintiff,** | |
| **v.** | |
| **UNITED STATES,** | **Before: Claire R. Kelly, Judge** |
| **Defendant,** | **Consol. Court No. 18-00111** |
| **and** | **PUBLIC VERSION** |
| **NATIONAL BIODIESEL BOARD FAIR TRADE COALITION,** | |
| **Defendant-Intervenor and Consolidated Defendant-Intervenor.** | |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's remand redetermination making a particular market situation adjustment for soybean input prices when determining constructed value.]

Dated: March 25, 2021

<u>Daniel L. Porter</u>, <u>Christopher A. Dunn</u>, <u>James P. Durling</u>, and <u>Valerie S. Ellis</u>, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for plaintiffs Vicentin S.A.I.C., Oleaginosa Morenos Hermanos S.A., and Molinos Agro S.A.

<u>Gregory J. Spak</u>, White & Case LLP, of Washington, DC, for consolidated plaintiff LDC Argentina S.A. Also on the brief was <u>Jessica Lynd</u>.

<u>Joshua E. Kurland</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. Also on the brief were <u>Jeffrey Bossert Clark</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>,

Director, and <u>L. Misha Preheim</u>, Assistant Director. Of Counsel was <u>Daniel J. Calhoun</u>, Assistant Chief Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Myles S. Getlan</u>, Cassidy Levy Kent (USA) LLP, of Washington, DC, for defendant-intervenor and consolidated defendant-intervenor National Biodiesel Board Fair Trade Coalition. Also on the brief were <u>Jack A. Levy</u>, <u>Thomas M. Beline</u>, and <u>Chase J. Dunn</u>.

Kelly, Judge:  Before the court for review are the final results of the U.S. Department of Commerce's ("Commerce") second remand redetermination pursuant to the court's order in <u>Vicentin S.A.I.C. v. United States</u>, 44 CIT __, 466 F. Supp. 3d 1227 (2020) ("<u>Vicentin II</u>").  <u>See</u> Final Results of Redetermination Pursuant to Ct. Remand [in <u>Vicentin II</u>] Confidential Version, Nov. 12, 2020, ECF No. 107-1 ("<u>Second Remand Results</u>").  In <u>Vicentin II</u>, the court remanded for further explanation or reconsideration Commerce's decision—when determining the normal value (here, constructed value) of biodiesel from Argentina—to disregard reported costs for soybeans in Argentina, and to instead use world market prices for soybeans as a means of correcting for a cost distortion caused by a particular market situation ("PMS").  <u>See</u> 44 CIT at __, 466 F. Supp. 3d at 1242–46.  Since Commerce countervailed the export tax regime giving rise to the PMS in a concurrent countervailing duty ("CVD") proceeding, the court instructed Commerce to either reconsider its PMS adjustment or further explain why the adjustment is necessary given that the distortion caused by the subsidy may have already been cured by the

CVD.  See id.  On remand, Commerce, under respectful protest,[1] conducts a "pass-

through" analysis of prices for U.S. sales of subject Argentine biodiesel to

demonstrate that the countervailed export tax regime did not affect the difference

between the constructed value of the merchandise and U.S. prices in this instance.

See Second Remand Results at 4–17.  According to Commerce, a showing that the

subsidy at issue did not affect U.S. prices assuages the court's concerns that the CVDs

remedying those subsidies also cures the same harm addressed by the PMS

adjustment here.  See id.  For the following reasons, Commerce's second remand

redetermination is sustained.

## BACKGROUND

The court presumes familiarity with the facts as set out in its previous opinions

ordering remand to Commerce, and now recounts the facts relevant to the court's

review of the Second Remand Results.  See Vicentin II, 44 CIT at __, 466 F. Supp. 3d

at  1230–33; see also Vicentin S.A.I.C. v. United States, 43 CIT __, __, 404 F. Supp.

3d 1323, 1327–29 (2019) ("Vicentin I").  On March 1, 2018, Commerce published its

final determination pursuant to its less-than-fair-value ("LTFV") investigation of

biodiesel from Argentina.  See Biodiesel from Argentina, 83 Fed. Reg. 8,837 (Dep't

Commerce Mar. 1, 2020) (final determination of sales at [LTFV] and final affirmative

determination of critical circumstances, in part) ("Final Results") and accompanying

---

[1] By adopting a position "under protest," Commerce preserves its right to appeal.  See
Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003).

Issues and Decisions Memo. for the [Final Results], A-357-820, Feb. 20, 2018, ECF

No. 16-5 ("Final Decision Memo").  Commerce calculated estimated weighted-average

dumping margins of 60.44 and 86.41 percent for mandatory respondents LDC

Argentina S.A. ("LDC Argentina" or "LDC") and Vicentin S.A.I.C.,[2] respectively, and

an estimated all-others margin of 74.73 percent.  Final Results, 83 Fed. Reg. at 8,838.

Pursuant to U.S. Court of International Trade Rule 56.2, Vicentin S.A.I.C.,

Oleaginosa Morenos Hermanos S.A., and Molinos Agro S.A. (collectively "Vicentin")

as well as LDC Argentina, commenced this consolidated action challenging

Commerce's final determination.  See generally [Vicentin's] Mot. J. Agency R., Oct.

29, 2018, ECF No. 26; Rule 56.2 Mot. J. Agency R. on Behalf of Consol. Pl. [LDC

Argentina], Oct. 29, 2018, ECF No. 25.

Vicentin I remanded Commerce's final determination for further explanation

or reconsideration.  See 43 CIT at __, 404 F. Supp. 3d at 1343.  The court held that

Commerce's adjustment to constructed value to neutralize the value of renewable

identification numbers ("RINs")[3] reflected in prices for U.S. sales of biodiesel was

---

[2] Commerce treated Vicentin S.A.I.C., and companies Renova S.A., Oleaginosa
Moreno Hermanos S.A., Molinos Agro S.A., Patagonia Energia S.A., VFG Inversiones
y Actividades Especiales S.A., Vicentin S.A.I.C. Sucursal Uy, Trading Company X,
and Molinos Overseas Commodities S.A. as a single collapsed entity.  See Final
Results, 83 Fed. Reg. at 8,838 n.8 (citations omitted).

[3] RINs are tradeable credits pursuant to a U.S. regulatory scheme administered by

(footnote continued)

unlawful.  See Vicentin I, 43 CIT at __, 404 F. Supp. 3d at 1329–35.  Moreover, although the court held that Commerce's finding that a PMS arising from the Government of Argentina's ("GOA") export tax regime distorted the reported costs of soybeans (a primary input in the production of biodiesel), as well as Commerce's consequent reliance on market-determined prices for soybeans to determine the constructed value of biodiesel, were not precluded by statute, see id. at __, 404 F. Supp. 3d at 1334–37, and that the PMS finding was lawful,  see id. at __, 404 F. Supp 3d at 1337–40, the court held that Commerce's determination was unsupported by substantial evidence because Commerce failed to reasonably explain how the purported market-distortion was not already cured by CVDs imposed on the export tax regime in a concurrent CVD case.  See id. at __, 404 F. Supp. 3d at 1340–43.

Vicentin II sustained in part and remanded in part Commerce's first remand redetermination.  See 44 CIT at __, 466 F. Supp. 3d at  1233–46.  The court sustained

---

the Environmental Protection Agency ("EPA").  See Vicentin I, 43 CIT at __, 404 F. Supp. 3d at 1328 (citing Biodiesel From Argentina, 82 Fed. Reg. 50,391 (Dep't Commerce Oct. 31, 2017) (preliminary affirmative determination of sales at [LTFV], prelim. affirmative determination of critical circumstances, in part) ("Prelim. Results") and accompanying Decision Memo. for the [Prelim Results] at 28–30, PD 353, bar code 3632930-01 (Oct. 19, 2017)).  The EPA requires that biodiesel producers or importers ("obligated parties") meet an annual "renewable volume obligation," pursuant to which obligated parties must submit RINs equal to the number of gallons of renewable fuel comprising their renewable volume obligation.  Id. (citations omitted).  RINs are generated through biodiesel production in the United States or importation of biodiesel.  Id. (citations omitted).  The obligated party that generates RINs may use them to satisfy its renewable volume obligation, or it may trade or sell them to other obligated parties.  Id. (citations omitted).

Commerce's decision to neutralize the difference in value between U.S. sales of biodiesel and foreign market sales of biodiesel owing to premiums placed on RIN-eligible U.S. sales by reducing U.S. prices by an estimated value for RINs—as well as Commerce's methodology for calculating the adjustment.  See id. at __, 466 F. Supp. 3d at 1233–42.   However, the court remanded for further explanation or reconsideration Commerce's refusal to explain why an unadjusted cost-based PMS remedy in this case was necessary even though the export tax regime giving rise to the cost distortion was countervailed by duties imposed pursuant to a concurrent CVD proceeding.  See id. at __, 466 F. Supp. 3d at 1242–46.  The court observed that Commerce's explication of the different purposes of the ADD and CVD regimes did not address the court's concerns regarding the reasonableness of Commerce remedying the effects of a domestic subsidy that may have already been cured in the concurrent CVD proceeding.  See id. at __, 466 F. Supp. 3d at  1244.

On November 13, 2020, Commerce filed its second remand redetermination. See generally Second Remand Results.  Commerce, under protest, sought to comply with the court's remand order in Vicentin II by conducting a pass-through analysis of U.S. prices.  See id. at 8–17.  On December 14, 2020, LDC Argentina filed comments challenging the final results of Commerce's second remand redetermination.  See Cmts. on [Second Remand Results], Dec. 14, 2020, ECF No. 112 ("LDC's Br.").  On January 13, 2021, Defendant and Defendant-Intervenor National Biodiesel Board Fair Trade Coalition filed their replies to LDC's comments.  Def.'s Resp. Cmts. on

[Second Remand Results], Jan. 13, 2021, ECF No. 114 ("Def.'s Br."); Def.-Intervenor's

Cmts. on [Second Remand Results], Jan. 13, 2021, ECF No. 113 ("Def.-Intervenor's

Br.").

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516a(a)(2)(B)(i) of the Tariff Act

of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018)[4] and 28 U.S.C. § 1581(c)

(2018), which grant the court authority to review actions contesting the final

determination in an ADD investigation. The court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law . . ." 19 U.S.C. §

1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are

also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture

(Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014)

(quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587

F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

I.    **Commerce's Pass-Through Analysis is Reasonable**

LDC submits that Commerce's focus on a "pass-through" analysis of U.S. prices

is "misguided" and does not address the court's concerns that Commerce's cost-based

---

[4] Further citations to the Tariff Act of 1930, as amended, are to the relevant
provisions of Title 19 of the U.S. Code, 2018 edition.

PMS adjustment may remedy a distortion that was already cured by the concurrent CVD proceeding.  See LDC's Br. at 1–13.  Defendant and Defendant-Intervenor counter that Commerce's methodology is a reasonable means of addressing the court's concerns.  See Def.'s Br. at 12–24; Def.-Intervenor's Br. at 9–11. For the following reasons, Commerce's pass-through analysis demonstrates that the PMS remedy is reasonable.

When investigating whether merchandise is (or is likely to be) sold in the U.S. at LTFV, Commerce makes a comparison between the export price (or constructed export price) of sales of the merchandise into the U.S. and its normal value.  See 19 U.S.C. § 1677b(a).  The "normal value" of the merchandise may be based upon home market or third-country sales that are made in the ordinary course of trade, or constructed value.  See 19 U.S.C. § 1677b(a)(1)(B)–(C), (a)(4).  Commerce may determine normal value based upon constructed value, rather than home market sales, where a PMS distorts prices in the home market.  See 19 U.S.C. § 1677b(a)(1)(B)(ii)(III), (C)(ii); see also id. § 1677b(a)(4).[5]  The statute further provides that, when calculating constructed value, the presence of a separate "cost-based" PMS permits Commerce to deviate from the typical methodology:

> For purposes of paragraph (1), if a [PMS] exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade,

---

[5] Commerce resorted to constructed value after finding that "domestic biodiesel sales prices are established by the government and are not based on competitive market conditions[,]" resulting in a PMS.  Final Decision Memo at 16.

> the administering authority may use another calculation methodology
> under this part or any other calculation methodology.

19 U.S.C. § 1677b(e).  Therefore, when using constructed value, Commerce may resort

to any other calculation methodology if a PMS renders the cost of materials and

fabrication unsuitable for use as normal value.  Commerce's determinations must be

supported by substantial evidence, such that a reasonable mind might accept the

evidence as adequate to support Commerce's conclusion while considering

contradictory evidence.  See Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938);

see also Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978,

985 (Fed. Cir. 1994).

Although the statute empowers Commerce to use another methodology

provided under the statute—or any other methodology it chooses—to establish

constructed value in light of a PMS, the methodology it chooses must be reasonable.

The court reviews Commerce's determinations for substantial evidence, meaning that

they are reasonable given the factual record in the case.  See Huaiyin Foreign Trade

Corp. v. United States, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (citing Atl. Sugar, Ltd.

v. United States, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).  The lack of a statutory

directive does not render Commerce's alternative methodology reasonable.  See Motor

Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43–49

(1983) ("Motor Vehicle").  The problem posed by Vicentin II is whether Commerce's

imposition of an unadjusted PMS remedy is reasonable as a methodological and

Consol. Court No. 18-00111                                                Page 10
**PUBLIC VERSION**

factual matter in this case.[6]  See Vicentin II, 44 CIT at __, 466 F. Supp. 3d at 1244–

46.

Here, Commerce seeks to demonstrate the reasonableness of its unadjusted

PMS remedy by conducting a "pass-through" analysis of U.S. sales.  See Second

Remand Results at 8–12.  Commerce developed this pass-through analysis in order

to comply with the statutory mandate in ADD investigations involving merchandise

from a nonmarket economy ("NME") country, where there is a concurrent CVD

proceeding involving the same subject merchandise.  See 19 U.S.C. § 1677f-1(f)(1); see

also, e.g., Wheatland Tube Co. v. United States, 38 CIT __, __, 26 F. Supp. 3d 1372,

1378–88 (2014) ("Wheatland").  In ADD investigations involving an NME country

where a countervailable subsidy has been provided with respect to the subject class

or kind of merchandise, the statute provides for a reduction in ADDs where, inter

alia, a "countervailable subsidy has been demonstrated to have reduced the average

price of imports of the class or kind of merchandise during the relevant period[.]"  19

U.S.C. § 1677f-1(f)(1).  Commerce's "pass-through" analysis of U.S. sales determines

whether the subsidy reduced the price of imports such that an offset may be

necessary.  See Second Remand Results at 9.  According to Commerce, "in

_____

[6] Commerce argues there is no presumption that domestic subsidies typically reduce
U.S. prices such that it is incumbent upon Commerce to prove otherwise.  See, e.g.,
Second Remand Results at 8, 13–17.  Whether there should be such a presumption is
for Commerce to determine in the first instance.  However, Commerce must provide
an explanation as to why its methodology is reasonable.  See Motor Vehicle, 463 U.S.
at 48–49.

administering 19 U.S.C. § 1677f-1(f)(1) . . . Commerce has required the producer or

exporter under examination to demonstrate: a 'subsidies-to-cost link,' e.g., the

subsidy's effect on cost of manufacture; and, a 'cost-to-price link,' e.g., the producer's

or exporter's prices changed as a result of changes in cost of manufacture." Id. at 9

(citations omitted).  Commerce also inquires whether "countervailable subsidies have

been demonstrated to have reduced the average price of imports during the period

under examination." Id. at 9–10.  Implicit in any determination from Commerce that

the subsidies did not affect the price of imports is the finding that CVDs do not affect

the dumping margin.  See id.; cf. 19 U.S.C. § 1677f-1(f) (providing for an adjustment

of the impact of CVDs in cases where the domestic subsidies affected the price of

imports).

　　　LDC asserts that Commerce's remand redetermination does not respond

directly to the court's inquiry.  See, e.g., LDC's Br. at 1, 4–5, 9.  Indeed, Commerce

elides several analytical steps when explaining how its demonstration that U.S.

prices are unaffected by the export tax regime addresses the court's concern that the

cost-based PMS remedy targets a distortion that Commerce has already cured.  In

adopting Vicentin II's comparison to Commerce's methodology in NME proceedings,

Commerce posits that if a "subsidy affects neither U.S. price nor normal value, the

even-handedness of the subsidy's effects is maintained and no portion of the LTFV

differential can be attributed to the subsidy." Second Remand Results at 9; see also

Vicentin II, 44 CIT at __, 466 F. Supp. 3d at 1245.  Left unaddressed by Commerce's

stated position, however, is how it would cohere with the court's concern regarding the protection afforded to the domestic industry when Commerce countervails a domestic subsidy.  See, e.g., Vicentin II, 44 CIT at __, 466 F. Supp. 3d at 1244 ("Commerce's use of an alternative methodology . . . may remedy the effects of domestic subsidy already remedied by the concurrent CVD case[.]").  As LDC submits, "once a particular benefit has been neutralized through the imposition of a CVD," it would not appear "reasonable to seek to neutralize it again in the [ADD] case."  See LDC's Br. at 10; see also id. at 12 (arguing that the cost-distortion Commerce addresses with its PMS adjustment relates to the benefit that Commerce neutralized in the concurrent CVD proceeding.).[7]

---

[7] LDC argues that this case is distinguishable from the NME context, where a pass-through analysis would be appropriate.  See LDC's Br. at 12–13.  More specifically, in the NME context Commerce uses surrogate values for factors of production to build a normal value, which is different from what happens in this case where Commerce is using constructed value to build a normal value from costs in the home country, but seeking to provide a substitute for the actual costs of soybeans because of the PMS caused by the domestic subsidy.  Despite the somewhat analogous actions of replacing a home market sales price based normal value with a substitute out of a concern that prices in the home market are not appropriate, LDC focuses on the fact that here the export tax gives rise to both the subsidy and the PMS adjustment.  Thus, LDC argues that as the CVD cured the export tax subsidy, it therefore cured the PMS.

LDC's argument appears to conflate the cost-distortion Commerce seeks to cure in this case with the broader array of benefits that Commerce may remedy in a CVD proceeding.  See LDC's Br. at 12 ("...the 'benefit' that Commerce purports to neutralize in the subsidies case relates to the same soybean input cost.").  Vincetin II instructed Commerce to explain whether "any distortion created by the PMS in this

(footnote continued)

Although Commerce does not directly respond to the court's concerns that the CVDs imposed in the concurrent proceeding cure the distortion giving rise to the cost-based PMS adjustment here, it is reasonably discernible, based on several statements made throughout these proceedings and in this remand redetermination,[8] that Commerce's failure to do so stems from its position that, due to differences between

---

case has not already been remedied by the concurrent CVD case." 44 CIT at __, 466 F. Supp. 3d at 1244. The PMS is the GOA's export tax regime and the distortion it causes is an artificially reduced price for soybeans in the home market. It is unclear the full array of benefits that companies may be afforded as a result of the export tax regime. The subsidy may have allowed benefiting companies to invest in new technologies or products, pay the workforce more, lower export prices, or any number of things. In light of the possibility that the cost-distortion itself was already addressed by imposition of CVDs, however, the court instructed Commerce to explain why its PMS adjustment in this case was nonetheless reasonable. In response, Commerce's pass-through analysis addresses whether the CVDs remedied lower U.S. prices by delinking any reduced costs of soybeans from the U.S. prices. In the absence of such a linkage, the court understands Commerce to have addressed its concern that the CVDs impact the relationship between U.S. prices and normal value for the dumping calculation.

[8] First, Commerce rejects the notion that domestic subsidies typically reduce U.S. prices. See, e.g., Second Remand Results at 8, 18. Second, Commerce references the proposition set forth in its initial remand redetermination that "CVD law imposes duties in an amount equal to the subsidy, rather than the effects of the subsidy, and does not remedy sales at [LTFV]." Second Remand Results at 5–6; see also Final Results of Redetermination Pursuant to Ct. Remand [in Vicentin I] at 24–27, Jan. 31, 2020, ECF No. 79-1. Finally, Commerce asserts that refusing a PMS adjustment "risks undermining the relief afforded to the domestic industry by Congress, given the complexity of tying subsides in a foreign market to export prices in the United States." Second Remand Results at 21; see also, e.g., id. at 15 & nn. 52–53. Reasonably discernible from these statements is Commerce's position that its methods for countervailing a domestic subsidy are such that duties imposed pursuant to the concurrent CVD proceeding likely do not redress the precise trade effect arising from the cost distortion that Commerce targets by rendering its cost-based PMS remedy in this antidumping case.

Consol. Court No. 18-00111                                                    Page 14
**PUBLIC VERSION**

the CVD and ADD regimes, it assumes CVDs that target domestic subsidies do not

address artificially low U.S. prices.  See Final Results of Redetermination Pursuant

to Ct. Remand [in Vicentin I] at  25–26, Jan. 31, 2020, ECF No. 79-1 ("Remand

Results").  And although the court and the parties have referred to the problem as

one involving a potential double remedy, the problem as illustrated by Commerce's

adoption of the pass-through methodology is one of determining whether the dumping

margin is affected by duties imposed to countervail the domestic subsidy in the

concurrent proceeding.[9]   Commerce uses the pass-through analysis to ascertain

whether the imposition of a CVD in a subsidy case affects the analysis in the

antidumping case.  Only if the CVDs affect the dumping analysis would the potential

for a double remedy arise.

        In this case, Commerce finds the reported costs that would be used to construct

the normal value of the subject merchandise inadequate because there exists a PMS

that distorts the cost of soybeans.  See Final Decision Memo at 26 ("Commerce

─────────────────

[9] Commerce calculates a dumping margin based on the difference between U.S. price
and normal value of subject products imported into the United States.  See 19 U.S.C.
§§  1677(34)–(35), 1677b, 1677a.   In contrast Commerce imposes CVDs after
calculating an ad valorem subsidy rate based on the amount of benefit allocated
during the period of review or investigation divided by the sales value during the
same period of the product to which Commerce attributes the subsidy.  See 19 C.F.R.
§ 351.525(a), (b)(3) (2015).   For domestic subsidies, Commerce generally attributes
the subsidy to all products sold by a firm, including products that are exported,
subject to the additional provisions of 19 C.F.R. § 351.525(b).  See id. § 351.525(b)(3);
see also, e.g., [CVD] Investigation of Biodiesel from Argentina: Preliminary
Calculations for [LDC] at 4–6,  C-357-821, POR 01/01/16–12/31/2016, (Apr. 21, 2017)
(ACCESS bar code 3610731-01) available at https://access.trade.gov.

continues to find that it is appropriate to make a PMS adjustment to soybean prices to correct for distortions that are caused by Argentina's export tax regime and render soybean prices outside the ordinary course of trade."); see also 19 U.S.C. § 1677b(e). Commerce therefore "rel[ies] on world market prices for soybeans which ha[ve] not been distorted by the GOA's export tax, in determining the cost of soybeans." Remand Results at 24.  Further, Commerce now supplements its determination with record evidence regarding a respondent's pricing behavior in the U.S. market by employing the pass-through analysis.  See Second Remand Results at 8–12.  Commerce finds that U.S. prices are adequate for purposes of calculating ADDs because U.S. prices are set based on considerations unrelated to any cost-benefit provided by the domestic subsidy.  See id. at 9.  By seeking to demonstrate the U.S. prices for LDC's sales are unaffected by the export tax regime in Argentina, Commerce supplies facts from which a reasonable mind may infer that Commerce here imposes duties calculated based on an accurate dumping margin.  Commerce's methodology for its second remand redetermination is reasonable.

In objecting to the relevance of a pass-through analysis in this context, Commerce erects a straw man out of the court's reference to Low Enriched Uranium From France in Vicentin II.  See Second Remand Results at 13–17; see also Vicentin II, 44 CIT at __, 466 F. Supp. 3d at 1244–45 (citing Low Enriched Uranium From France, 69 Fed. Reg. 46,501, 46,506 (Dep't Commerce Aug. 3, 2004) (notice of final results of [ADD] admin. review) ("Low Enriched Uranium From France")).  Vicentin

II held that Commerce's attempt to justify its imposition of an unadjusted PMS remedy by pointing to differences between the ADD and CVD regimes is not reasonable.  See id. at __, 466 F. Supp. 3d at 1242–45.  To illustrate the need for further explanation, the court pointed to Commerce's reasoning in Low Enriched Uranium From France as support for the proposition that "domestic subsidies are presumed to impact both sides of the LTFV equation, such that any price differential between normal value and U.S. Price is presumed to result from something other than the subsidy."  Id. at __, 466 F. Supp. 3d at 1244–45 (citing Low Enriched Uranium From France, 69 Fed. Reg. at 46,506).  Commerce's lengthy refutation of the court's reference to Low Enriched Uranium From France as espousing the view that Commerce has previously determined "all domestic subsidies are presumptively fully passed through to export prices or that the effect of subsidies on export prices can be determined with any degree of certainty" is thus misguided and distracts from the question posed by the court in Vicentin II.  Second Remand Results at 14.  Vicentin II asks Commerce to explain why its methodology is reasonable, when it would appear that domestic subsidies may affect both sides of the LTFV equation as acknowledged by Commerce in Low Enriched Uranium From France.  See 44 CIT at __, 466 F. Supp. 3d at 1242–45.  Here, Commerce determines that the domestic subsidies did not affect either side of the LTFV equation.  Second Remand Results at 12.  That determination must be reasonable.  In this case, by using a pass-through analysis, Commerce supports its determination by demonstrating that the domestic

subsidy did not affect U.S. prices. As a result, Commerce reasonably addresses the court's concern that its PMS adjustment potentially leads to an inaccurate dumping margin.

## II.   Commerce's Determination is Reasonable

LDC contends that Commerce's analysis remains unsupported by substantial evidence and that Commerce failed to solicit information necessary to perform the analysis accurately. LDC's Br. at 13–19. Defendant and Defendant-Intervenor argue that Commerce's determination is supported by substantial evidence demonstrating that LDC's U.S. prices were not affected by the GOA's export tax regime. See Def.'s Br. at 12–24; Def.-Intervenor's Br. at 11–15. Defendant adds that LDC failed to exhaust its argument that Commerce was required to solicit information necessary for conducting a pass-through analysis. See Def.'s Br. at 22.

Commerce determines the potential for a double remedy based on record evidence regarding whether there is a cost-to-price link and whether the domestic subsidy affects U.S. prices. See Second Remand Results at 9–10 (citing 19 U.S.C. § 1677f-1(f)(1)). Commerce's determination is supported by substantial evidence where there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). However, the "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)

Consol. Court No. 18-00111                                              Page 18
**PUBLIC VERSION**

("<u>Universal Camera Corp.</u>"). Nevertheless, "the possibility of drawing two

inconsistent conclusions from the evidence does not invalidate Commerce's conclusion

as long as it remains supported by substantial evidence on the record." <u>Zhaoqing</u>

<u>New Zhongya Aluminum Co. v. United States</u>, 36 CIT 1390, 1392, 887 F. Supp. 2d

1301, 1305 (2012) (citing <u>Universal Camera Corp.</u>, 340 U.S. at 488).

Commerce points to statements made during LDC and Vicentin's verification,

as well as findings contained in the U.S. International Trade Commission's ("ITC")

preliminary report in its investigation of biodiesel from Argentina, to support its

determination that "there is no cost-to-price link and that the subsidy has not

otherwise 'reduced the average price of imports of the class or kind of merchandise[.]'"

<u>Second Remand Results</u> at 10–12 (citing 19 U.S.C. § 1677f-1(f)(1)(B)).  Namely,

Commerce cites LDC's explanation at verification that LDC's U.S. affiliate agreed to

U.S. sales of biodiesel that were "generally priced based on New York Mercantile

Exchange (["NYMEX"]) heating oil futures prices plus some specified premium[.]"[10]

---

[10] Commerce also observes that [[

]].

<u>Second Remand Results</u> at 10 & n.38 (citing Memo. re: Verification of the Sales
Responses of [LDC] in [ADD] Investigation of Biodiesel from Argentina at 9, PD 410,
CD 909, bar codes 3645896-01, 3645895-01 (Nov. 29, 2017) ("LDC Sales Verification
Report")).  According to Commerce, company officials from LDC's U.S. sales affiliate
would later state "that U.S. companies typically prefer NYMEX heating oil prices,
since biodiesel is regarded [as] fuel and heating oil reflects fuel prices, whereas
Argentine transactions typically rely on CBOT soybean oil prices as they generally
regard biodiesel less as fuel and more similar to a soybean product." <u>Id.</u> (quoting
LDC CEP Verification Report at 17).

**PUBLIC VERSION**

Id. at 10 (quoting Memo. re: CEP Sales Verification of [LDC] in ADD Investigation of

Biodiesel from Argentina at 6, PD 413, CD 912, bar codes 3646257-01, 3646256-01

(Nov. 30, 2017) ("LDC CEP Verification Report")).[11]   Moreover, according to

Commerce, officials at Vicentin "explained that the company may sell biodiesel at a

flat price or based on a Chicago Board of Trade (["CBOT"]) future price, plus or minus

a premium."[12]  Second Remand Results at 10–11 (quoting Memo. re: Verification of

the Sales Questionnaire Responses of [Vicentin] at 26 [sic], PD 414, CD 913, bar codes

3646347-01, 3646345-01 (Nov. 30, 2017) ("Vicentin Verification Report")).  Commerce

notes that the ITC Preliminary Report's description of the industry confirms these

---

[11] On June 25, 2018, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination.  These indices are located on the docket at ECF Nos. 16-2–3.  On February 14, 2020, Defendant filed indices to the public and confidential administrative records underlying Commerce's remand redetermination.  These indices are located on the docket at ECF Nos. 80-2– 3.  On November 27, 2020 Defendant filed indices to the public and confidential administrative records underlying Commerce's second remand redetermination. These indices are located on the docket at ECF Nos. 109-2–3.  All references to documents from the initial administrative record are identified by the numbers assigned by Commerce in the June 25th indices, see ECF No. 16, and preceded by "PD" or "CD" to denote the public or confidential documents, respectively.  All references to the administrative record for the remand determination are identified by the numbers assigned in the February 14th indices, see ECF No. 80, and preceded by "PR" or "CR" to denote remand public or confidential documents, respectively.  All references to the administrative record for the second remand redetermination are identified by the numbers assigned in the November 27th indices, see ECF No. 109, and preceded by "PRR" or "CRR" to denote second remand public or confidential documents, respectively.

[12] Commerce observes that [[

                                                 ]]  Second Remand Results at 11 (citing Vicentin Verification Report at 27).

explanations, pointing specifically to the report's finding that "[b]iodiesel has traditionally been marketed primarily as an additive or alternative to petroleum-based diesel fuel, and, as a result, biodiesel prices have been influenced by the price of petroleum-based diesel fuel, adjusted for government incentives supporting renewable fuels, rather than biomass based diesel production costs." Second Remand Results at 11 (quoting Petitioner's PMS Allegation Ex. 9 at VI-7, PDs 189, 191–92, bar codes 3604083-01, 3604083-03–04 (Aug. 2, 2017) ("ITC Prelim. Report")).

According to Commerce, pricing information from ITC Preliminary Report and other record sources also "demonstrates Argentine prices for U.S. shipments correspond to the overall U.S. market, and not to the cost of soybeans in Argentina." Second Remand Results at 11–12.  The report indicates that the average price of Argentine biodiesel dropped from 2014 to 2015, and then rose in 2016.  See id. (citing ITC Prelim. Report at Tables C-1 & IV-2).  Citing a U.S. Department of Agriculture report contained in the petition, Commerce observes that the "export tax on Argentine soybeans fell from 35 percent to 30 percent" during this same time period. Id. at 12.  (citing Petitioner's Letter, "ADD and CVD Petitions" Vol. II, Ex. GEN-30 at 4, PDs 3–5, bar codes 3554221-03–5 (Mar. 23, 2017) ("Petition Vol. II")).  Commerce reasons that "[i]f the presumptions underlying the double remedy theory were true, Argentine prices to the United States should have risen during this period."  Id. However, here, Commerce's assertion that the export tax on soybeans from 35 percent to 30 percent during the same time period does not appear to be supported by the

page that Commerce cites from the report, as the relevant statement indicates that

the reduction would have occurred either on or after December of 2015.  See Petition

Vol. II, Ex. GEN-30 at 4.  As such, Commerce's reliance on the reduction of export

taxes on Argentine soybeans to support its findings is not persuasive.  Nevertheless,

Commerce otherwise provides enough evidence for a reasonable mind to conclude that

the benefit of subsidized soybeans is not passed-through to U.S. prices.

Indeed, Commerce highlights record evidence that the drop in Argentine

biodiesel prices from 2014 to 2015, followed by the increase prices in 2016, tracks

prices for other imports of biodiesel during this time period.  Id.  Information

published by the U.S. Department of Agriculture and the U.S. Census Bureau depicts

a similar pattern in U.S., Argentine, and Indonesian biodiesel prices in the United

States from 2014 through 2016.  Id. (citing Petition Vol. II at Ex. GEN-28).  "As the

record demonstrates LDC and Vicentin price their U.S. shipments in a manner

designed to compete with (or undercut) U.S. prices for petro-diesel and biodiesel, and

not based on the domestic subsidy, Commerce concludes there is no significant link

between the subsidy and U.S. prices."  Id.

Commerce's determination is supported by substantial evidence and

sufficiently addresses the question posed by the court's remand order.  It is

reasonable to infer, based on LDC and Vicentin's statements during verification

regarding U.S. prices for Argentine biodiesel being tied to oil futures, as corroborated

by evidence from the ITC Preliminary Report and sources from the petition, that any

**PUBLIC VERSION**

downward pressure on soybean costs owing to Argentina's export tax regime is not

passed-through to U.S. prices.  If a company prices its U.S. sales based on external

price movements, a reasonable mind can conclude that the company is not

incorporating the benefit of a domestic subsidy.  Although LDC argues that

Commerce departed from agency practice and failed to solicit enough information to

conduct its analysis, see LDC's Br. at 15–20 (citing, inter alia, Wheatland, 38 CIT at

__, 26 F. Supp. 3d at 1385), as Defendant notes, LDC did not raise that argument

before Commerce and thus failed to exhaust its administrative remedies with respect

to that issue.  See 28 U.S.C. § 2637(d); Boomerang Tube LLC v. United States, 856

F.3d 908, 912–13 (Fed. Cir. 2017); see also Def.'s Br. at 22.  As such, Commerce's

second remand redetermination is sustained.

## CONCLUSION

        For the foregoing reasons, Commerce's second remand redetermination

complies with the court's order in Vicentin II, is in accordance with law and supported

by substantial evidence, and is therefore sustained.  Judgment will enter accordingly.


                                                            /s/ Claire R. Kelly
                                                            Claire R. Kelly, Judge


Dated:          March 25, 2021
                New York, New York